FILED

2016 FEB -8 AM 10:33

UNITED STATES DISTRICT COURT

PRESTON LEONARD SCHOFIELD PRO SE

VS.

STATE OF FLORIDA ET. AL.

SEMINOLE COUNTY SHERIFF'S OFFICE

8:16cv294T33AEP

HILLSBOROUGH COUNTY SHERIFF'S OFFICE

PINELLAS COUNTY SHERIFF'S OFFICE

# 42 U.S.C. CIVIL RIGHTS LAWSUIT 1983, MOTION TO APPOINT AN ATTORNEY AND MOTION FOR JURY TRIAL

I, PRESTON LEONARD SCHOFIELD PRO SE DO HEREBYAFFIRM THAT THIS NOTARIZED AFFADAVIT OF THE VIOLATIONS OF MY CONSTITUTIONAL RIGHTS OCCURRED IN THE STATE OF FLORIDA FROM APRIL 2011 UNTIL PRESENT.

THE STATE OF FLORIDA IN ORDER TO MAKE MY PRO SE MOTIONS NULL AND VOID AND THE FEDERAL AND STATES COURTS CONSPIRED TO DEPRIVE ME OF "DUE PROCESS" "ACCESS TO THE COURTS" AND "EQUAL PROTECTION UNDER THE LAW". THESE ACTIONS INCLUDE BUT ARE NOT LIMITED TO VIOLATIONS OF THE FIRST, FOURTH, FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, COLOR OF LAW ABUSES(DEPRIVATION OF PROPERTY, EXCESSIVE FORCE, FALSE ARREST, FALSE IMPRISONMENT AND FABRICATION OF EVIDENCE).

1. PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED KNOWINGLY, DELIBERATELY, WILFULLY AND INTENTIONALLY IN THIS CASE. THESE RIGHTS INCLUDE BUT ARE NOT LIMITED TO:
   A. UNITED STATES CONSTITUTION AMENDMENT FIRST(RIGHT TO REDRESS THE GOVERNMENT).
   B. UNITED STATES CONSTITUTION AMENDMENT FOURTH(UNUSUAL SEARCHES AND SEIZURES).
   C. UNITED STATES CONSTITUTION AMENDMENT FIFTH(DUE PROCESS).

n.e

D. UNITED STATES CONSTITUTION AMENDMENT SIXTH(COMPULSORY PROCESS, RIGHT TO FACE ACCUSER AND RIGHT TO SPEEDY TRIAL).
E. UNITED STATES CONSTITUTION AMENDMENT EIGHT(CRUEL AND UNUSUAL PUNISHMENT)
F. UNITED STATES CONSTITUTION AMENDMENT FOURTEENTH(EQUAL PROTECTION CLAUSE AND DUE PROCESS).
G. OBSTRUCTION OF JUSTICE.
H. COLOR OF LAW ABUSES(DEPRIVATION OF PROPERTY, EXCESSIVE FORCE, FALSE ARREST, FALSE IMPRISONMENT AND FABRICATION OF EVIDENCE).

A. JUDGE JAMES DeKLEVA COUNTINUED TO ILLEGALLY ARREST AND DETAIN ME IN CASES 2011MM4051A, 2011MM4272A AND 2013MM1092A FROM OCTOBER 2, 2013 UNTIL JANUARY 2015. AT NO TIME DID JUDGE JAMES DeKLEVA OR THE TRIAL COURT HAVE JURISDICTION TO DO SO. I CHALLENGED JUDGE DeKLEVA'S JURISDICTION AND HE FAILED TO CONDUCT A HEARING TO DETERMINE IF HE HAD JURISDICTION IN THIS MATTER. JUDGE DeKLEVA ILLEGALLY ARRESTED ME AGAIN IN JANUARY 2014 AND APRIL 2014 IN ORDER TO PREVENT DUE PROCESS IN MY CASES. CASE 2013MM1092A WAS A FABRICATED CASE BY JUDGE DeKLELA. JUDGE DeKLEVA ALLOWED ME AN ALL WHITE JURY, NO WITNESSES, NO DISCOVERY AND ILLEGALLY CONSFICATED $1,000 CASH. THE TRIAL COURT HAD NO JURISDICTION IN THIS MATTER!

B. JUDGE HEINRICH, ESPINOSA, DOMINQUEZ AND GRECO JR. ILLEGALLY ARRESTED ME IN CASE 14-CM-000070 APRIL 2014 AFTER SPEEDY TRIAL HAD CLEARLY EXPIRED IN MY CASES. THE COURT DOCUMENTATION AND MY PERSONAL RECORDS PROVED THIS CASE. THE TRIAL COURT HAD NO JURISDICTION IN THIS MATTER!

C. JUDGE THANE COVERT ILLEGALLY ARRESTED ME IN CASE 14-14665 IN JANUARY 2015. JUDGE COVERT REFUSED TO GRANT ME A SPEEDY TRIAL UPON DEMAND WITHIN SIXTY DAYS AS I FILED THE APPROPIATE MOTION ON JANUARY 20, 2015. THERE WAS NO CALENDER CALL HELD WITHIN FIVE(5)DAYS AS APPROPIATE. JUDGE COVERT SELECTED AN ALL WHITE JURY, DENIED ME APPROPIATE DISCOVERY, REFUSED TO ALLOW ME TO HAVE WITNESSES AND VIDEO TAPE OF THE INCIDENT, DENIED ME THE "STAND YOUR GROUND DEFENSE", "THE RIGHT TO PROTECT MY PROPERTY", AND CHARGED ME WITH A FELONY EVEN WHEN THE STATE'S WITNESSES STATED I HAD NOL WEAPON(BAT), ALLOWED THE STATE TO HAVE FOUR WITNESSES, AND HAD A JURY POOL OF 27 WHITES AND ONE BLACK MALE. THE TRIAL COURT HAD NO JURISDICTION IN THIS MATTER!

D. THE SEMINOLE COUNTY SHERIFF'S DEPARTMENT ILLEGALLY PLACED ME IN SOLITARY CONFINEMENT AFTER I ORDERED MY OWN PERSONAL PAPERBACK LAW FROM

AMAZON.COM. I WAS GIVEN NO HEARING AND ALLOWED NO WITNESSES. I WAS TOLD BY LT. WILLIAMS THAT IF I SURRENDERED MY PERSONAL LAW BOOKS THAT I COULD LEAVE SOLITARY CONFINEMENT. I REFUSED TO SIGN THE DOCUMENTATION THAT WAS REQUIRED BY LT. WILLIAMS. I WAS DENIED ACCESS TO THE LAW LIBRARY FOR CURRENT PRECEDENTS FOR CASE LAW. THERE WASN'T A CERTIFIED LAW CLERK AVAILABLE TO ASSIST ME IN PREPARING REQUIRED COURT DOCUMENTATION. I HAD SHANITA TOBY EMAIL SHERIFF DONALD ESLINGER CONCERNING THESE CIVIL RIGHTS VIOLATIONS. I NEVER RECEIVED A RESPONSE FROM SHERIFF ESLINGER. I WAS TOLD BY THE OFFICERS TO CEASE FROM CONTACTING THE SHERIFF CONCERNING EMPLOYEES VIOLATING POLICY AND PROCEDURES AT THE SEMINOLE COUNTY JAIL.

E. THE PINELLAS COUNTY SHERIFF'S DEPARTMENT ILLEGALLY PLACED ME IN SOLITARY CONFINEMENT AFTER I REFUSED TO DO FORCED LABOR FOR THE JAIL. I WAS GIVEN NO HEARING AND ALLOWED NO WITNESSES. I WAS TOLD BY JAIL STAFF THAT IF I TOOK A JOB IN THE LAUNDRY THAT I COULD LEAVE SOLITARY CONFINEMENT. I REFUSED TO WORK BASED ON MY FEDERAL DISABILITY DIAGNOSIS. THE STAFF REFUSED TO ALLOW ME TO HAVE USE OF THE TELEPHONE TO CONTACT THE FEDERAL GOVERNMENT FOR THE NECESSARY DOCUMENTATION THAT WAS REQUIRED NOT TO DO FORCED LABOR AT PINELLAS COUNTY JAIL. I WAS DENIED ACCESS TO THE LAW LIBRARY FOR CURRENT PRECEDENTS FOR CASE LAW. THERE WASN'T A CERTIFIED LAW CLERK AVAILABLE TO ASSIST ME IN PREPARING REQUIRED COURT DOCUMENTATION. I HAD SHANITA TOBY EMAIL SHERIFF GUALITIERI CONCERNING THESE CIVIL RIGHTS VIOLATIONS. I NEVER RECEIVED A RESPONSE FROM SHERIFF GUALITIERIN CONCERNING MY COMPALINTS. I WAS TOLD BY THE OFFICERS TO CEASE FROM CONTACTING THE SHERIFF CONCERNING EMPLOYEES VIOLATING POLICY AND PROCEDURES AT THE PINELLAS COUNTY JAIL.

F. THE HILLSBOROUGH COUNTY SHERIFF'S DEPARTMENT ILLEGALLY PREVENTED ME FROM SENDING MAIL TO THE APPROPIATE STATE AND FEDERAL COURTS. CPT. HERMANN INFORMED ME THAT I HAD PLACED TOO MUCH LEGAL MAIL IN THEIR SYSTEM. I WAS DENIED ACCESS TO THE LAW LIBRARY FOR CURRENT PRECEDENTS FOR CASE LAW. THERE WASN'T A CERTIFIED LAW CLERK AVAILABLE TO ASSIST ME IN PREPARING REQUIRED COURT DOCUMENTATION. I HAD SHANITA TOBY EMAIL SHERIFF GEE CONCERNING THESE CIVIL RIGHTS VIOLATIONS. I NEVER RECEIVED A RESPONSE FROM SHERIFF GEE. I WAS TOLD BY THE OFFICERS TO CEASE FROM CONTACTING THE SHERIFF CONCERNING EMPLOYEES VIOLATING POLICY AND PROCEDURES AT THE HILLSBOROUGH COUNTY JAIL.

G. THE ABOVE LISTED DEFENDANTS ACTIONS AND LACK THEREOF LED TO THE PETITIONER PRESTON LEONARD SCHOFIELD PRO SE BEING DENIED JUSTICE IN HIS CASES BEFORE THE COURT. THE ALLOWED CRIMES TO BE COMMITED AGAINST THE PETITIONER IN THESES MATTERS BY COMMITTING SOME OF THEM THEMSELVES. THE PEOPLE AT THE RESPECTIVE INSTITUTIONS OF JUSTICE MUST BE HELD ACCOUNTABLE TODAY FOR THEIR BIAS ACTIONS.

H. EQUAL PROTECTION UNDER THE LAW OF THE FOURTEENTH AMENDMENT OF THE U.S CONSTITUTION ISN'T SELECTIVE. IT'S MEANT TO PROTECT ALL PERSONS REGARDLESS OF CREED, COLOR, RELIGION, OR FINANCIAL STATUS. I ASK THE U.S DEPARTMENT OF JUSTICE, THE FEDERAL BUREAU OF INVESTIGATION AND THE FLORIDA DEPARTMENT OF LAW ENFORCEMENT TO DO AN IMMEDIATE INVESTIGATION WITH MY WITNESSES AND I, PROVIDE A VIDEO RECORDING OF ME TAKING A DEPARTMENT OF DEFENSE POLYGRAPH TEST AT MY EXPENSE TO PROVE MY CASE OF CIVIL RIGHTS VIOLATIONS BY THE STATE OF FLORIDA. UPON COMPLETION OF THE INVESTIGATION RECOMMEND TO FLORIDA ATTORNEY GENERAL PAM BIONDI CHARGES BE FILED AGAINST THE APPROPIATE DEFENDANTS AND RELEASE THE INVESTIGATION TO THE PUBLIC!

I WAS CHARGED WITH DOMESTIC BATTERY BY THE STATE OF FLORIDA ON APRIL 8, 2011. I IMMEDIATELY CONTACTED ATTORNEY CHRISTINA BUCHAN FOR LEGAL REPRESENTATION FOR THE CRIMINAL CHARGE AND FOR THE CUSTODY OF MY FOUR(4) MINOR CHOLDREN, AHMAD, RAHEEM, AZZIZI AND KEZIAH SCHOFIELD. ON APRIL 19, 2011, I FAXED MY REQUEST "DEMAND FOR SPEEDY TRIAL" TO CHRISTINA BUCHANS SECRETARY, MRS. LYONS. I EXPRESSED MY INTENTIONS TO RESOLVE THE CASES AS SOON AS POSSIBLE. MY CHILDREN WERE AWARDED TO KZONIC CALHOUN AFTER SHE FILED FALSE CHARGES WITH THE COURT. I WAS "AFFORDED NO HEARING WHERE I WAS COULD SPEAK IN THIS MATTER". WHEN I ASKED CHRISTINA BUCHAN TO CONTEST THIS MATTER, SHE INFORMED ME THAT I WAS GETTING FIFTY PERCENT TIME WITH MY CHILDREN. I WENT TO COURT ON APRIL 21, 2011 AND CHRISTINA BUCHAN WAS NOT PRESENT TO REPRESENT ME AS AGREED UPON. EDWARD VU REPRESENTED ME IN PLACE OF MRS. BUCHAN BEFORE JUDGE ALAN DICKEY. MR. VU GAVE MY FINANCIAL STATEMENTS OF MY DISABILITY PAY TO KZONIC CALHOUN BUT DIDN'T PROVIDE A STATEMENT OF MRS. CALHOUN'S FINANCIAL STATEMENT. I APPEARED BEFORE GENERAL MAGISTRATE MARCI LANGLOIS FOR CUSTODY OF MY CHILDREN WITH CHRISTINA BUCHAN. I ASKED MRS. BUCHAN TO INFORM GM LANGLOIS THAT KZONIC CALHOUN HAD COMMITTED PERJURY IN THE CASE SEVERAL TIMES. MS. CALHOUN HAD COMMITTED PERJURY TO SEMINOLE COUNTY CHILD PROTECTIVE SERVICES, THE SANFORD POLICE DEPARTMENT, THE STATE ATTORNEY AND SEMINOLE COUNTY SHERIFF'S OFFICE. MRS.

BUCHAN REFUSED IN OPEN COURT TO INFORM GM LANGLOIS OF THESE CRIMES COMMITTED BY MS. CALHOUN. THE NEXT TIME I APPEARED BEFORE GM LANGLOIS, MS. CALHOUN WASN'T PRESENT FOR THE HEARING. I ASKED MRS. BUCHAN TO IMMEDIATELY REQUEST A DEFAULT JUDGMENT ON MY BEHALF. AGAIN, MRS. BUCHAN REFUSED TO REPRESENT MY INTEREST IN THIS MATTER AS APPROPIATE FOR MY "ATTORNEY OF RECORD". WHEN I BROUGHT THIS UP TO GM LANGLOIS, SHE REFUSED TO ALLOW ME TO SPEAK ON MY BEHALF. I IMMEDIATELY TERMINATED MRS. BUCHAN FROM REPRESENTING ME IN MY CHILD CUSTODY CASE.

2. IN JUNE 2011, SPEEDY TRIAL HAD EXPIRED IN MY CRIMINAL CASES, SO I ASKED MRS. BUCHAN FOR A "MOTION TO DISCHARGE" PER FLORIDA RULES OF CRIMINAL PROCEDURES 3.191(p). MRS. BUCHAN REFUSED TO ASK FOR SAID MOTION PER MY REQUEST AND ASKED IN OPEN COURT FOR A CONTINUANCE. I NEVER ASKED MRS. BUCHAN FOR ANY CONTINUANCES IN ANY MATTER BEFORE THE COURT. I FILED A MOTION TO THE COURT IN WRITING AND ORALLY FOR THE CHARGES AGAINST ME TO BE DISMISSED FOREVER PER FLORIDA RULES OF CRIMINAL PROCEDURES. THE TRIAL COURT AND THE JUDGES NEVER RESPONDED TO MY MOTIONS AS REQUIRED BY FLORIDA LAWS.

3. THE TRIAL COURT CONTINUED TO HAVE ME COME TO COURT ONLY TO GRANT A CONTINUANCE TO THE STATE ATTORNEYS OFFICE. I ASKED FOR A 'CHANGE OF VENUE" DUE TO "PREJUDICE", "BIAS", "RACISM" AND "CONFLICT OF INTEREST" IN MY CASE. ASSISTANT STATE ATTORNEY JACOB POLK WORKED FOR THE ALLEGED VICTIM AT THE SANFORD RESCUE MISSION. MR. POLK ALSO WAS THE PROSECUTING ATTORNEY IN MY CASES. *THE TRIAL COURT REFUSED TO ANSWER MY REQUESTS FOR "CHANGE OF VENUE" AND "MOTION TO DISCHARGE WITH PREJUDICE FOREVER" AS APPROPIATE.

## FACTS OF THE CASE

2. THE PETITIONER WAS ILLEGALLY ARRESTED AND DETAINED ON JULY 10, 2014 ON A WARRANT ISSUED BY SEMINOLE COUNTY, FLORIDA. THE PETITIONER WAS ORIGINALLY CHARGED WITH A FABRICATED CRIME ON APRIL 8, 2011.
3. THE PETITIONER SPENT 415 ACTUAL DAYS ILLEGALLY INCARCERATED ON THE "FABRICATED CHARGES" IN CASE 2011MM4051A. THE SENTENCE ONLY CARRIED SIXTY DAYS.
4. ON DECEMBER 2, 2014 THE PETITIONER WAS RELEASED FROM ILLEGAL INCARCERATION ON THE CHARGES IN THIS MATTER.
5. THE PETITIONER HAD DEMANDED A HEARING WITHIN SIXTY DAYS PER FLORIDA RULES OF CRIMINAL PROCEDURES 3.191(b) ON APRIL 19, 2011.

6. THE PETITIONER NEVER RECEIVED A TRIAL IN THIS MATTER WITHIN SIXTY DAYS .
7. THE PETITIONER REQUESTED DISCOVERY IN THIS CASE CONCERNING THE ALLEGED CONTEMPT CHARGE. THE DISCOVERY WAS NEVER GIVEN TO THE PETITIONER.
8. THE PETITIONER WAS "HARMED" BY THE ACTIONS OF THE STATE OF FLORIDA IN THIS MATTER.
9. PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED KNOWINGLY, DELIBERATELY, WILFULLY AND INTENTIONALLY IN THIS CASE. THESE RIGHTS INCLUDE BUT ARE NOT LIMITED TO:
   I. UNITED STATES CONSTITUTION AMENDMENT FIRST(RIGHT TO REDRESS THE GOVERNMENT).
   J. UNITED STATES CONSTITUTION AMENDMENT FOURTH(UNUSUAL SEARCHES AND SEIZURES).
   K. UNITED STATES CONSTITUTION AMENDMENT FIFTH(DUE PROCESS).
   L. UNITED STATES CONSTITUTION AMENDMENT SIXTH(COMPULSORY PROCESS, RIGHT TO FACE ACCUSER AND RIGHT TO SPEEDY TRIAL).
   M. UNITED STATES CONSTITUTION AMENDMENT EIGHT(CRUEL AND UNUSUAL PUNISHMENT)
   N. UNITED STATES CONSTITUTION AMENDMENT FOURTEENTH(EQUAL PROTECTION CLAUSE AND DUE PROCESS).
   O. OBSTRUCTION OF JUSTICE.
   P. COLOR OF LAW ABUSES(DEPRIVATION OF PROPERTY, EXCESSIVE FORCE, FALSE ARREST, FALSE IMPRISONMENT AND FABRICATION OF EVIDENCE).

WHEREFORE THE PETITIONER, PRESTON LEONARD SCHOFIELD PRO SE RESPECTFULLY ASKS THIS HONORABLE COURT TO IMMEDIATELY ISSUE A COURT ORDER:

1. GRANT PETITIONER'S MOTION FOR COMPENSATORY AND PUNITIVE DAMAGES IN THIS MATTER BY ISSUING AN ORDER GRANTING PETITIONER'S RELIEF.
2. GRANTING AN IMMEDIATE HEARING IN THIS MATTER WITHIN SEVEN DAYS.
3. NOTIFYING THE PETITIONER VIA THE COURTS EFILING SYSTEM TO PREVENT MISCOMMUNICATION BETWEEN THE PARTIES.
4. CONDUCT AN "OPEN AND PUBLIC HEARING" IN THIS MATTER.
5. GRANT A WRIT OF MANDAMUS PROVIDING TO THE PETITIONER VIA THE COURTS EFILING SYSTEM A COPY OF ALL AFFIDAVITS UTILIZED TO OBTAIN A WARRANT IN THIS CASE, A COPY OF ALL TESTIMONY IN THIS MATTER AND A COPY OF THE WARRANTS ISSUED TO OBTAIN PETITIONER'S ARREST AT NO EXPENSE TO THE PETITIONER.
6. ADDRESS EACH OF THE PETITIONER'S CIVIL RIGHTS COMPLAINTS LISTED ABOVE INDIVIDUALLY IN WRITING.

7. GRANT AN ORDER FOR TO APPOINT THE PETITIONER AN EXPERIENCED, ETHICAL AND AGGRESSIVE CIVIL RIGHTS ATTORNEY IN THIS MATTER. THE PETITIONER HAS PRESENTED HIS CASE TO ATTORNEYS AND LAW FIRMS IN THIS MATTER. DUE TO THE THE FEES OF $50,000 PAYMENT UP FRONT, THE PETITIONER IS UNABLE TO AFFORD AN ATTORNY INTHIS CASE OF DELIBERATE, WILLFUL, KNOWINGLY AND INTENTIONAL VIOLATIONS OF PETITIONER'S CIVIL RIGHTS BY THE DEFENDANTS IN THIS CASE. THE PETITIONER ISN'T LEGALLY EDUCATED ENOUGH TO PREPARE THIS CASE SO THAT THE CLERK'S OFFICE WILL ALLOW IT TO PROCEED BEFORE AN INDEPENDENT AND IMPARTIAL JURY IN A PUBLIC TRIAL.
8. GRANT AN ORDER ALLOWING THE PETITIONE RTO PROCEED "INFORMA PAUPERIS" INTHIS MATTER.
9. GRANT AN ORDER FOR THIS MATTER TO PROCEED BEFORE AN IMPARTIAL JURY.
10. GRANT THE PETITIONER THE SUM OF TWO(2) MILLION DOLLARS IN THIS MATTER PAYABLE TO THE PETITIONER ONLY. IF THE COURT DOESN'T RESPOND WITHIN SEVEN DAYS, GRANT IMMEDIATE DEFAULT JUDGMENT TO PETITIONER ONLY.

# MEMORANDUM OF LAW

A. Under federal law, a U.S. attorney can bring a prosecution against a state official for civil rights violations if that official has acted with the specific intent to deprive a citizen of a right protected by the Constitution.[1] In the case of the Diallo officers, a federal prosecution would be based upon the premise that the officers willfully deprived Diallo of his constitutional right to be free from excessive force.[2] There are serious difficulties to overcome if a prosecutor is going to bring a case accusing an officer of using excessive and deadly force during a street encounter or arrest. Although

* Law Clerk to the Honorable Alexander Williams, Jr., United States District Court, District of Maryland; J.D., 2002, New York University School of Law; B.A., 1998, Yale University. My gratitude goes to Anthony Maul and the editorial staff of the *New York University Journal of Legislation and Public Policy* for their customarily excellent editorial work. For guidance in the preparation of this Note, I wish to thank Professor Stephen J. Schulhofer, Professor Harry I. Subin, Professor Anthony C. Thompson, Eric Womack, and Robert Abrahams. I would also wish to thank Ricardo Mendez, Professor Kim A. Taylor-Thompson, the Honorable Carlos Moreno, Francisco Leal, my family, and, most of all, Kim-Thu Posnett.

1. *See* 18 U.S.C. § 242 (2000). The pertinent parts of that statute are:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year . . . .

*Id.* For the seminal case upon which the "specific intent" requirement is based, see *Screws v. United States*, 325 U.S. 91 (1945).

2. The right to be free from excessive police force is derived from the due process clause of the Fourteenth Amendment, U.S. CONST. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). *See also* Tennessee v. Garner, 471 U.S. 1 (1984) (holding Fourth Amendment prohibits use of excessive or deadly force by police officer to apprehend felon, absent necessity and probable cause of threat of death or serious physical injury to officer or others).





these difficulties have been overcome in a number of cases—most notably in the prosecution of the officers in the beating of Rodney King—the federal prosecutor for the Southern District of New York chose not to bring a civil rights prosecution against the officers who shot Diallo.[3] The question remains whether the U.S. attorney's rationale for not bringing an indictment was proper in light of case law and other policy considerations.

The first hurdle in federal criminal prosecutions involves concerns over federalism and local sovereignty that have led the federal government to move cautiously into areas that traditionally have been under local control. Since state prosecutors handle most criminal law enforcement, with notable exceptions in the areas of drugs and money laundering, a federal prosecutor normally will not step in unless there is a formidable and pressing federal interest (for example, if the state prosecution was manifestly inadequate).[4] If that federal interest is present, then prosecutors must overcome a difficult *mens rea* requirement in order to prove that the officers possessed the specific intent to

deprive Diallo of his right to be free from excessive force.[5] In the Diallo case, the federal interest appeared substantial, especially in light of the publicity over the shooting and the arguably shoddy state prosecution. Nevertheless, the prosecutor decided not to bring a prosecution because she felt as though the government could not overcome the second hurdle: proving beyond a reasonable doubt that the officers acted with the specific intent to use unreasonable force in their encounter with Diallo[6].

The facts of the case present a picture that could, from a prosecutorial standpoint, be viewed more optimistically. The four officers of the Street Crimes Unit of the New York City Police Department (NYPD) approached Diallo late one evening as Diallo stood

3. *See* Susan Sachs, *U.S. Decides Not to Prosecute 4 Officers Who Killed Diallo*, N.Y. TIMES, Feb. 1, 2001, at B1.
4. Jane Fritsch, *Hurdles Seen for U.S. Rights Case in Diallo Shooting*, N.Y. TIMES, Mar. 1, 2000, at B1 (stating that Justice Department guidelines "have three requirements: that the case involve 'a substantial federal interest,' that the original trial left that interest 'unvindicated' and that there is strong enough evidence to win a conviction").
5. Matthew V. Hess, Comment, *Good Cop-Bad Cop: Reassessing the Legal Remedies for Police Misconduct*, 1993 UTAH L. REV. 149, 186 ("The prosecution must prove the officer intended the precise deprivation proscribed by federal law."). *See also* Laurie L. Levenson, *The Future of State and Federal Civil Rights Prosecutions: The Lessons of the Rodney King Trial*, 41 UCLA L. REV. 509, 556–57 (1994) ("The federal prosecutor must prove that the officers intended to use force they *knew* was unreasonable.").
6. *See* Sachs, *supra* note 3. R



outside his home in the Soundview section of the Bronx. Believing they had reasonable suspicion to stop-and-frisk Diallo on the basis that he might be a rape suspect, the officers, who were not in uniform, approached and announced themselves as police.[7] The following events proceeded with startling speed. According to the officers, they requested a word with Diallo and asked that he keep his hands where they could see them.[8] Diallo then retreated into his vestibule and reached for an object in his pocket. Believing that Diallo was pulling out a weapon, one officer shouted, "Gun!" and the four officers began to shoot into the vestibule. In the confusion, one officer tripped off the stairs. The others, believing that an officer had been shot, emptied forty-one bullets into the vestibule where the suspect was located.[9] At the end of the brief encounter, Diallo was dead with nineteen bullet wounds.[10] Diallo had not been reaching for a gun, but for his wallet.[11] The officers made a terrible mistake. But was their mistake also a crime under federal civil rights law?[12]

A consideration of the precedent and the facts of the case demonstrates that the federal prosecutor should have convened a grand jury to seek an indictment of the officers under § 242.[13] In *Screws v.*

7. *See* Jeffrey Toobin, *The Unasked Question: Why the Diallo Case Missed the Point*, NEW YORKER, Mar. 6, 2000, at 38, 40–41.
8. *Id.* at 42.
9. *Id.* at 38, 43.
10. *Diallo Shot While Down, Jury Is Told*, L.A. TIMES, Feb. 9, 2000, at A13.
11. *See* Toobin, *supra* note 7, at 43. R
12. Unless a necessary state prosecution was handled poorly, or did not transpire at all, a federal prosecutor generally will not bring a case against officers accused of

civil rights violations. The jury in the state trial for the murder and manslaughter of Diallo, held in Albany, New York, found that the officers had not committed a crime under state law. Although many argue that second-guessing state criminal proceedings is a futile, the prosecution in the state trial appears to have suffered from some grave inadequacies and mistakes. For instance, the lead prosecutor had not tried a major case in nearly a decade. *See* Carl W. Thomas, *Shake the Trees*, VILLAGE VOICE, Mar. 28, 2000, at 43. Furthermore, when the four officers—who were, significantly, the only eyewitnesses to the event—testified with inconsistent stories, the prosecution failed to attack their credibility. *Id.* ("The prosecution's incompetence stretches further with the mishandling of the key defense witnesses."). *But see* Stuart Taylor, Jr., *Should the Feds Prosecute the Cops Who Killed Diallo?*, NAT'L J., Mar. 4, 2000, at 673, 674 (arguing that many in courtroom were impressed by eloquence of the prosecutors). The prosecutors failed to call a witness to rebut testimony regarding police procedure, forcing the jury to accept the defense's theories on that issue. *See* Maria Hinajosa, *Diallo Jurors say Prosecutors Made 'Huge Mistakes'*, CNN.COM, Feb. 29, 2000, *at* http://www.cnn.com/2000/US/02/28/diallo.jurors.

13. This note presumes that *but for* the problems in proving specific intent, the U.S. attorney would have brought charges. Decisions to prosecute are often very complex and it is certainly possible that there were other reasons why the U.S. attorney did not want to indict these officers (for example, other issues of evidence and proof). This paper, for the sake of argument, proceeds under the presumption that the U.S. attor



*United States*, the Supreme Court held that, in order to indict a state official on a charge of violation of constitutional rights, the federal prosecutor must prove that the state official acted with the specific intent to violate those rights.[14] This *mens rea* requirement continues to be the controlling legal standard, but courts diverge in its actual application. Some courts interpret *Screws* to stand for the proposition that prosecutors can prove guilt only by showing that an officer knowingly and willfully violated a specific constitutional right. Other courts hold that the prosecutor needs to show only a "reckless disregard of the law" in proving a violation under the statute.[15]

This Note argues that the latter courts have the better argument, in terms of both interpretation and policy. Because numerous courts have held that the intent requirement is satisfied when state officials act with reckless disregard, the U.S. attorney in the Diallo case should have convened a grand jury to decide if the police officers acted with such reckless disregard of Diallo's rights.[16] The facts demonstrate that the officers, in their behavior during the encounter with Diallo, may have acted in reckless disregard of the prohibition against the use of unreasonable and deadly force. Therefore, the U.S. attorney should not have claimed, prior to a grand jury examination, that the officers lacked the specific intent to violate the Fourth Amendment. When officers such as those in the Diallo case act in reckless disregard of a suspect's constitutional rights, prosecutors should act to vindicate those rights.[17]

ney's public explanation for her decision not to charge—that there was insufficient evidence to prove specific intent—contains the essence of her rationale.

14. Screws v. United States, 325 U.S. 91, 103 (1945).

15. *See infra* Part I.

16. *See, e.g.*, United States v. Bradley, 196 F.3d 762 (7th Cir. 1999) (holding that defendant's reckless disregard for law constituted willful violation of federal rights sufficient to uphold § 242 conviction). For a discussion of why a *federal* prosecution would be necessary as opposed to a state prosecution, see *infra* Part IV.

17. A separate, although relevant, element that any prosecutor would have to prove in a § 242 prosecution is the actual violation of an identifiable constitutional right. *See* United States v. Lanier, 520 U.S. 259 (1997) (holding that defendant accused of

**sexually assaulting women while serving as state judge had adequate notice that alleged conduct violated women's constitutional rights, even where no prior decision explicitly identified violation of constitutional rights under similar circumstances). After the Supreme Court's ruling in *Graham v. Connor*, the force used by police officers in the course of a street encounter is to be judged under the Fourth Amendment's "objective reasonableness" standard, although the court is free to consider numerous factors such as the severity of the crime and the potential for harm to other civilians. 490 U.S. 386 (1989). The Supreme Court has also held that the use of *deadly* force during an encounter or arrest must be judged for reasonableness. *See* Tennessee v. Garner, 471 U.S. 1 (1985).**
**2002] *A TRAGEDY AND***

# Pruitt v. Mote, 503 F. 3d 647 - Court of Appeals, 7th Circuit 2007

ReadHow citedSearch

## How this document has been cited

When presented with a request to appoint counsel, the Court must make the following inquiries: "(1) has the... plaintiff made a reasonable attempt to obtain counsel or effectively been precluded from doing so and (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself."
- in FASULLO v. FASULLO, 2009 and 263 similar citations

—the question is whether the difficulty of the case-factually and legally-exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself
- in LAMON v. Brown, 2014 and 199 similar citations

—determining whether the Court should attempt to find an attorney to voluntarily take a case, "the question is whether the difficulty of the case-factually and legally-exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.... The question is whether the plaintiff appears competent to litigate his own claims, given their degree ...
- in HEBELER v. State, 2014 and 108 similar citations

Although civil litigants do not have a constitutional or statutory right to appointed counsel, the court has the discretion torequest attorneys to represent indigents in appropriate cases pursuant to 28 USC § 1915 (e)(1).
- in Hart v. Jenkins, 2012 and 93 similar citations

In determining whether to make such a request, the Court must consider:(1) whether Plaintiff has made a reasonable attempt to obtain counsel or been effectively precluded from doing so (which he has); and if so,(2) given the difficulty of the case, whether Plaintiff appears competent to litigate the case himself.
- in Cooper v. Russell, 2013 and 252 similar citations

Under 28 USC § 1915 (e)(1), a court may request that an attorney represent an indigent litigant; the decision whether to recruit pro bono counsel is left to the discretion of the district court.
- in Collins v. Astrue, 2010 and 68 similar citations

As a threshold matter, litigants must make a reasonable attempt to secure private counsel on their own.
- in Allen v. BARKOVICH, 2013 and 96 similar citations

In order to make such a determination, the Court may consider, among other things, the complexity of the issues presented and the Plaintiff's education, skill, and experience as revealed by the record.
- in Brown v. Trice, 2014 and 55 similar citations

WebImagesMore...
Sign in

# Navejar v. Iyiola, 718 F. 3d 692 - Court of Appeals, 7th Circuit 2013

ReadHow citedSearch

Highlighting request to be appointed attorney

718 F.3d 692 (2013)

## Eduardo NAVEJAR, Plaintiff-Appellant,
## v.
## Akinola IYIOLA, et al., Defendants-Appellees.

No. 12-1182.

United States Court of Appeals, Seventh Circuit.

Submitted April 19, 2013.[*]
Decided May 29, 2013.

694*694 Eduardo Navejar (submitted), Pontiac, IL, pro se.

Christopher M.R. Turner, Attorney, Office of the Attorney General, Chicago, IL, for Defendants-Appellees.

Before EASTERBROOK, Chief Judge, and WILLIAMS and HAMILTON, Circuit Judges.

PER CURIAM.

Eduardo Navejar, an Illinois state prisoner, brawled with a prison guard. He swears that after guards subdued and handcuffed him, they kicked, stomped, and pepper-

sprayed him twice, and then they denied him adequate medical care. The district court denied his motions to recruit counsel and later entered summary judgment for the guards on his claims that they violated the Eighth Amendment. On appeal Navejar argues that the court erred by refusing to recruit counsel for him. Because the court applied the wrong legal standard to Navejar's motion, and the lack of counsel prejudiced him, we reverse.

We assume that the following factual allegations of the complaint are true and draw all possible inferences in favor of Navejar. *Biblia Abierta v. Banks*, 129 F.3d 899, 902 (7th Cir.1997). Navejar was imprisoned in Stateville Correctional Center in 2008. One evening while proceeding to the cafeteria, Navejar spoke to other inmates in their cells. Akinola Iyiola, a lieutenant at the prison, ordered him to get out of the cafeteria line because prison rules forbid inmates, while being transported, from stopping to speak to other inmates. Navejar disobeyed the order, became belligerent, and punched Iyiola. Other guards soon converged on the scene to assist Iyiola, and they wrestled Navejar to the ground where he was soon handcuffed.

Navejar described in an affidavit and at his deposition the force that guards used after they handcuffed and subdued him. He testified that Iyiola kicked him in the forehead near his eye, and an unidentified guard stomped his head against the ground. Next another guard, Sergeant Michael Grant, pepper-sprayed Navejar. Guards then dragged Navejar along the floor and carried him down some stairs where Iyiola sprayed more pepper spray in Navejar's face. Guards then left Navejar alone for a half-hour in a segregation cell, while he screamed in pain, before he was allowed to wash off the pepper spray.

The next morning a guard brought Navejar to Stateville's health care unit, where nurses examined him. But before a doctor could provide medical attention, Lieutenant Glen Elberson escorted Navejar out of the health care facility, explaining that he was being transferred to Pontiac Correctional Center. That afternoon at Pontiac, Navejar was examined by a physician, who concluded, after administering X-rays, that he had suffered only bruises and scratches.

Prison officials investigated the clash between Navejar and Iyiola and charged Navejar with four disciplinary violations: assaulting prison staff, creating a dangerous disturbance, insolence, and disobeying an order, all of which he denied. After a hearing, the disciplinary board found Navejar guilty. It concluded that Navejar started the physical altercation when he "suddenly swung" at Iyiola and that Iyiola was "hit on the nose and upper lip" during the ensuing fight. Among other punishments, the board revoked one year of good time credits. Navejar appealed the ruling and submitted a grievance accusing the guards of using excessive force. He lost both the appeal and the grievance.

695*695 Navejar then sued Iyiola, Grant, Elberson, and other unnamed prison guards in federal court, alleging that the guards used excessive force and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. *See* 42 U.S.C. § 1983. (He also brought a claim, no longer pursued, that the discipline violated his right to due process.) During discovery, the defendants produced a few

documents "as a courtesy" to Navejar. But they refused Navejar's other requests, including his request for more documents about or recordings of the altercation, citing security risks and burden.

Navejar moved four times for the recruitment of *pro bono* counsel. He filed two of his motions at the start of the case, another after the guards moved to dismiss his due-process claim, and a fourth after they moved for summary judgment. His motions asserted why he believed he was incapable of representing himself: he did not finish high school, he suffered from (an unspecified) mental illness, he had difficulty with English, he had repeatedly been moved from prison to prison and thus had trouble securing help for his case, and he had been denied access to the law library during prison lockdowns. Navejar's first two motions did not assert that he had sought counsel on his own; the district court never ruled on these motions. The third and fourth motions, though, explained that Navejar had contacted attorneys to represent him. The court denied these two motions.

But the court denied the latter two motions without citing *Pruitt v. Mote*, 503 F.3d 647 (7th Cir.2007) (en banc), and instead relied on older cases in brief minute orders. It began by applying the legal standard in *Gil v. Reed*, 381 F.3d 649, 656 (7th Cir.2004), in evaluating (1) whether the plaintiff appears competent "to try" the case himself, and (2) whether recruiting counsel "would provide a substantial benefit to the court or the parties, potentially affecting the outcome." The court concluded that counsel was unnecessary in Navejar's case because he "alleged no physical or mental disability" precluding him from investigating the facts of his case and "[n]either the legal issues raised in the complaint nor the evidence that might support Plaintiff's claims are so complex or intricate that a trained attorney is necessary."

The district court granted summary judgment for the prison guards. The court struck Navejar's statement of material facts and deemed admitted the defendants' statement, reasoning that Navejar had committed two critical errors: (1) impermissibly attempting to create a fact dispute by citing "self-serving evidence" — his affidavit where he asserted that guards beat and pepper-sprayed him after he was cuffed and subdued; and (2) adding his own factual assertions in response to the defendants' statement of facts, rather than presenting them in a separate statement, as required by N.D. ILL. L.R. 56.1(b)(3)(C). With the defendant's version of events uncontradicted, the court concluded that no reasonable jury could determine that the guards used excessive force against Navejar. Alternatively, the court reasoned, Navejar's excessive-force claim was barred by *Heck v. Humphrey*, 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), because the prison disciplinary board found Navejar guilty of assaulting Iyiola. Finally, the court concluded that Navejar could not recover for deliberate indifference against Elberson because no evidence suggested that Navejar suffered from a serious medical condition or that Elberson had a culpable mental state. (The district court's treatment of deliberate indifference was clearly correct, so we say nothing further about it.)

696*696 Navejar makes only one argument on appeal: that the district court abused its discretion by failing to recruit him a lawyer. In a civil case, the court has discretion to

recruit counsel to represent a litigant who is unable to afford one. 28 U.S.C. § 1915(e)(1); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866-67 (7th Cir.2013). In *Pruitt* we refined the standards for evaluating whether to recruit counsel. If a plaintiff makes a reasonable attempt to secure counsel, the court must examine "whether the difficulty of the case — factually and legally — exceeds the particular plaintiff's capacity as a layperson to coherently present it." *Pruitt*, 503 F.3d at 655. This inquiry does not focus solely on the plaintiff's ability to *try* his case — it also includes other "tasks that normally attend litigation" such as "evidence gathering" and "preparing and responding to motions." *Id.* When ruling on a motion to recruit counsel, the court should take account of all evidence in the record relevant to the plaintiff's capacity to litigate. *Id.* We will overturn the district court's decision only when the court has abused its discretion based on the evidence in the record when it ruled on the motion. *Id.* at 658-59. And even if the district court abuses its discretion, we will reverse only if the plaintiff shows prejudice — "a reasonable likelihood that the presence of counsel would have made a difference in the outcome of the litigation."*Id.* at 659 (emphasis removed).

In its orders denying Navejar's § 1915(e)(1) motions, the court erred in three ways. First, by relying on *Gil* instead of *Pruitt*, the court believed that it should decide whether Navejar was competent to *try* his case. *See* *Gil*, 381 F.3d at 656. But *Pruitt*clarified that the proper inquiry focuses on "whether the plaintiff appears competent to*litigate* his own claims," 503 F.3d at 655 (emphasis in original), with tactics like discovery and motion practice "that normally attend litigation." *Id.* Second, by stating without elaboration that Navejar's claims are not "so complex or intricate that a trained attorney is necessary," the district court resurrected boilerplate language that we disapproved of in *Pruitt* because it ignores the plaintiff's abilities. *Id.* at 649, 660. Although the court briefly referred to Navejar's competence, stating that Navejar "alleged no physical or mental disability," the record contradicts its statement. Navejar stressed his limited education, mental illness, language difficulties, and lack of access to fellow prisoners or other resources for assistance after his transfer from Stateville. *See also* ILL. ADMIN. CODE tit. 20, § 701.180(a) (restricting mail correspondence between inmates in different prisons). Third, the court asked whether recruiting counsel would substantially benefit "the court or the parties, potentially affecting the outcome." But in *Pruitt*, we distinguished the district court's inquiry from the standard of appellate review. *See* 503 F.3d at 654. *Pruitt* nowhere suggests that a district court should consider whether recruiting counsel would affect the outcome of a case; instead, that inquiry is reserved for the appellate court's review for prejudice. *See id.* at 659. By applying the wrong legal standard and failing to consider the record, the district court abused its discretion. *See* *Bracey v. Grondin*, 712 F.3d 1012, 1016-17 (7th Cir. 2013); *Santiago v. Walls*, 599 F.3d 749, 765 (7th Cir.2010); *Pruitt*, 503 F.3d at 660.

The district court, unfortunately, is not alone in relying on pre-*Pruitt* case law. Many other district judges in the Northern District of Illinois have recently and regularly issued substantially similar rulings. We have found more than 100 rulings from the Northern District of Illinois since *Pruitt* using the phrase "so complex or intricate that a trained attorney is necessary." 697*697 *See, e.g., Velazquez v. Kane Cnty. Jail Adult Judicial Center*, No. 13 C 0644, 2013 WL 523827, at *3 (N.D.Ill. Feb. 11, 2013); *Allen v.*

*Wexford Health Sources,* No. 12 C 50380, 2012 WL 6587792, at *4 (N.D.Ill.Dec. 17, 2012); *Birks v. Dart,* No. 12 C 7701, 2012 WL 5363439, at *3 (N.D.Ill. Oct. 30, 2012). Some of these orders (like the one in this case) do not cite *Pruitt* or subsequent case law. *See, e.g., Hutcherson v. Cook Cnty.,* No. 10C6215, 2010 WL 3951897, at *2 (N.D.Ill. Oct. 6, 2010); *Banks v. Mills,* No. 10C1486, 2010 WL 3307356, at *1 (N.D.Ill. Aug. 19, 2010); *Logan v. Godinez,* No. 10C4418, 2010 WL 2836957, at *3 (N.D.Ill. July 19, 2010). And these are only the rulings searchable through public databases; doubtless district judges have also used this obsolete language in orders not captured in these databases. We therefore take this opportunity to remind district courts about the individualized analysis that *Pruitt*requires, *see* 503 F.3d at 655-56, and caution against using boilerplate language that we criticized *en banc.*

Even though the district court applied the wrong standard, we will not reverse without a showing of prejudice — a "reasonable likelihood that the presence of counsel would have made a difference in the outcome of the litigation." *Id.* at 659 (emphasis removed). Prejudice (unlike abuse of discretion) may be established by an after-the-fact review "of a litigant's poor performance before or during trial." *Id.* at 659-60.

In this case, the absence of counsel likely prejudiced Navejar because the district court's ruling on summary judgment reveals two substantive errors. First, the court adopted the erroneous legal argument raised by the defendants in moving for summary judgment that Navejar could not rely on "self-serving evidence" to create a material factual dispute. This is wrong. "[W]e long ago buried — or at least tried to bury — the misconception that uncorroborated testimony from the nonmovant cannot prevent summary judgment because it is 'self-serving.'" *Berry v. Chicago Transit Auth.,* 618 F.3d 688, 691 (7th Cir.2010); *see also* *Darchak v. City of Chicago Bd. of Educ.,* 580 F.3d 622, 631 (7th Cir.2009); *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 504-06 (7th Cir.2004); *Payne v. Pauley,* 337 F.3d 767, 770-73 (7th Cir.2003). Here, Navejar attempted to present his side of the story at summary judgment through his affidavits and specific references to his deposition testimony. He contended that after he was subdued and handcuffed, Iyiola kicked him in the face, a prison guard stomped his head, guards dragged him across the floor, Grant and Iyiola pepper-sprayed him, and then left him alone for 30 minutes screaming in pain. With Navejar lacking counsel to reply to the defendants' erroneous contention that the district court may safely disregard his "self-serving" evidence, the district court accepted that contention and thereby prejudiced Navejar.

Second, the defendants argued that Navejar's excessive-force claim was *Heck*-barred because the prison board found Navejar guilty of disobeying orders and assaulting Iyiola. *See* *Edwards v. Balisok,* 520 U.S. 641, 648, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997); *Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). The district court again agreed with the guards, ruling that *Heck*bars the excessive-force claim. We disagree, observing as we have before that pro se prisoners are often tripped up by *Heck*'s complexities. *See* *Evans v. Poskon,* 603 F.3d 362, 364 (7th Cir.2010); *Gilbert v. Cook,* 512 F.3d 899, 901 (7th Cir. 2008). Navejar cannot deny that he disobeyed orders or assaulted Iyiola because 698*698those denials would "necessarily imply" the invalidity of his discipline. *See* *Moore v. Mahone,* 652 F.3d

722, 724-25 (7th Cir. 2011); *Evans*, 603 F.3d at 364; *Gilbert*, 512 F.3d at 900. But Navejar's assault on Iyiola is not necessarily inconsistent with his sworn contention that the guards answered his assault with excessive force *after*they subdued him. *See Gilbert*, 512 F.3d at 901-02 (reversing *Heck*-based judgment as a matter of law against inmate, remanding for trial on inmate's excessive-force claim despite prison board finding that inmate punched guard, and ordering district court to consider recruiting counsel); *Skrtich v. Thornton*, 280 F.3d 1295, 1301-02, 1304-05 (11th Cir. 2002). "Otherwise guards (and for that matter any public employee) could maul anyone who strikes them, without risk of civil liability as long as the private party is punished by criminal prosecution or prison discipline for the initial wrong." *Gilbert*, 512 F.3d at 901. Without a lawyer for Navejar to advocate the limits of *Heck,* the court mistakenly barred Navejar from arguing that, after he assaulted Iyiola, the guards responded with disproportionate force. *See* *Gilbert*, 512 F.3d at 901-02.

Beyond these two errors, Navejar was also prejudiced by proceeding without a lawyer after he was transferred from Stateville. Like the plaintiff who was transferred to a new prison in *Santiago,* once Navejar was transferred, he faced "significant problems" in litigating pro se because, once at another institution, he was not readily able to "identify key witnesses, depose the defendants and gather pertinent evidence," or proceed against John Doe defendants because he couldn't ascertain their identities. *Santiago*, 599 F.3d at 763, 766; *see also* *Pruitt*, 503 F.3d at 660. Navejar emphasizes that he was restricted from corresponding with individuals at Stateville, including those who might have been witnesses to the brawl. *See* ILL. ADMIN. CODE tit. 20, § 701.180(a). Aware of these limits, the named defendants avoided producing virtually everything he requested in discovery. Counsel would likely not have faced the same obstacles. *See* *Santiago*, 599 F.3d at 765.

We conclude that there is a reasonable likelihood that Navejar would have overcome summary judgment with the assistance of counsel. Accordingly, we REVERSE the grant of summary judgment on the excessive-force claim and REMAND for further proceedings consistent with this order, including the recruitment of counsel for Navejar. *See* *Pruitt*, 503 F.3d at 661. In all other respects the judgment is AFFIRMED.

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R.APP. P. 34(a)(2)(C).

## Navejar v. Iyiola, 718 F. 3d 692 - Court of Appeals, 7th Circuit 2013

ReadHow citedSearch

### How this document has been cited

The court has discretion to recruit counsel to represent a litigant who is unable to afford one in a civil case.
- in Vollmer v. Clarke, 2015 and 46 similar citations

If so, the Court must examine "whether the difficulty of the case-factually and legally-exceeds the particular plaintiff's capacity as a layperson to coherently present it."
- in Barnes v. MARION COUNTY CORRECTIONAL CENTER, 2014 and 37 similar citations

When a pro se litigant submits a request for assistance of counsel, the Court must first consider whether the indigent plaintiff has made reasonable attempts to secure counsel on his own.
- in Pierce v. DeVORE, 2015 and 28 similar citations

Ultimately, the Court must "take account of all [relevant] evidence in the record" and determine whether Plaintiff has the capacity to litigate this matter without the assistance of counsel.
- in LAMON v. Brown, 2014 and 21 similar citations

In other words, this inquiry is an individualized one based upon the record as a whole, the nature of the claims, and the plaintiff's ability to pursue his claims through all phases of the case, including discovery and trial.
- in Williams v. Quinn, 2014 and 8 similar citations

But this argument entirely ignores and directly contradicts what the Seventh Circuit has "repeatedly emphasized over the past decade"-namely, that "the term `self-serving'must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment. "
- in English v. General Electric Company, 2014 and 4 similar citations

Relying on the facts that Yang is unemployed, does not have funds to hire an attorney or expert witness to assist him, and lacks the knowledge and expertise required to litigate his Eighth Amendment deliberate indifference and state malpractice claims, the Court concluded that, given the difficulty of the case, Yang would be hard pressed to engage in the tasks that ...
- in Yang v. LUY, 2014 and 3 similar citations

755 F.3d 559 (2014)

## Ladell HENDERSON, Plaintiff-Appellant,
## v.
## Parthasarathi GHOSH, et al., Defendants-Appellees.

No. 13-2035.

United States Court of Appeals, Seventh Circuit.

Argued January 8, 2014.

Decided June 18, 2014.

560*560 Leslie D. Davis, Attorney, Drinker Biddle & Reath, LLP, Chicago, IL, for Plaintiff-Appellant.

561*561 Michael John Charysh, Attorney, Charysh & Schroeder, Ltd., Chicago, IL, for Defendants-Appellees.

Before BAUER, WILLIAMS, and TINDER, Circuit Judges.

PER CURIAM.

Ladell Henderson, a prisoner at the Stateville Correctional Center in Illinois, sued health care providers and other corrections employees alleging deliberate indifference to his serious medical needs. The district court denied his motions for recruitment of counsel filed during the pleading and discovery phases of the litigation. The defendants filed a motion for summary judgment, and Henderson filed another motion for recruitment of counsel, which was granted. After counsel filed Henderson's summary judgment response, the district court granted the defendants summary judgment. Henderson now appeals from that judgment, contending that it should be overturned because of error in the denials of his requests for recruitment of counsel. We reverse.

# I. Background

Henderson has been an inmate at Stateville since 1995. He was diagnosed with high blood pressure in 1999 and with diabetes in 2000. He has received some medical treatment for both conditions. In September 2009, Henderson suffered diabetic hypoglycemia and tremulous convulsions in his cell and was taken to Stateville's emergency room for evaluation. He underwent diagnostic testing, which revealed that his blood urea nitrogen, potassium, and creatinine levels were "out of range." At an appointment with Dr. Liping Zhang in early October 2009, Henderson was informed that he had a "bad kidney problem."

Later that month, Henderson was seen by a nephrologist who recommended immediate hospital admission for hemodialysis surgery and treatment. At the hospital Henderson was informed that he had "end-stage" or "Stage 5 kidney failure," which he understood to mean that he would have to undergo dialysis or he would die. According to Henderson, that was the first time anyone informed him that he had

kidney disease, renal insufficiency, or kidney failure. Henderson underwent a surgical procedure in order to undergo hemodialysis. He must undergo dialysis several times a week.

In October 2010, Henderson sued the defendants alleging that they acted with deliberate indifference to his serious medical needs. His complaint alleges that diagnostic testing revealed that his toxic waste levels were "out of range," but he was not notified of this fact nor treated for his kidney problems until he had reached Stage 5 kidney disease. At the same time he filed his complaint, Henderson filed a motion for leave to proceed in forma pauperis and a motion for recruitment of counsel under 28 U.S.C. § 1915(e)(1). The latter motion stated that Henderson was an inmate at Stateville, was "illiterate to" civil litigation, was "not competent to prosecute" his case, had a fifth grade education, and had presented his claims through the assistance of other inmates who had no obligation to help him. The affidavit of Lester Dobbey, the inmate who assisted Henderson in preparing his filings, was attached to the motion for counsel. The affidavit stated that Dobbey had only a GED and no formal legal education. It also said that Henderson had stated that he had a low IQ and was "incompetent" to prosecute his case himself.

In February 2011, the district court granted Henderson leave to proceed in forma pauperis and denied his motion for recruitment of counsel. The court found that Henderson had made a reasonable 562*562 attempt to secure counsel on his own, but concluded that recruitment of counsel was unnecessary at that time. The court acknowledged Henderson's assertion "that his filings have been prepared by other inmates," but noted the filings'"high quality for a pro se prisoner litigating his own case." In the court's determination, Henderson was "competent to litigate his own case." The motion for counsel was denied "without prejudice," and the order stated that Henderson "may renew his motion should circumstances change."

In July, Henderson filed an amended complaint. He also filed a motion for a discovery order, including a request for leave to depose the defendants, and a settlement proposal. A few defendants moved to dismiss the amended complaint; Henderson filed a response in opposition and moved for a default judgment against the defendants based on their non-compliance with his discovery requests. The district court denied that motion and directed the parties to attempt to resolve any discovery disputes among themselves before bringing the matter before the court.

Then the district court set pretrial deadlines: Fact discovery was ordered closed March 5, 2012; Rule 26(a)(2) expert disclosures were due one month later; and expert

discovery was closed one month after that. The court granted the defendants leave to depose Henderson; he was deposed in February 2012. At his deposition, Henderson expressed his desire to have representation of counsel, and he refused to answer questions relating to the merits of his case without assistance of counsel. This prompted the defendants to seek discovery sanctions against him and a 63-day extension of all discovery deadlines.

A few days later, Henderson filed his second motion for recruitment of counsel under § 1915(e)(1). The motion indicated that Henderson's education was unchanged and that "he does not have an adequate education to fully comprehend the ... proceedings as they occur." Henderson stated that he "is incompetent to continue to represent himself in" the discovery phase of the proceedings, including the depositions of the defendants and his own deposition. Henderson expressed a need to depose the defendants to adequately prepare for trial and asserted that "he is incapable of deposing [them] due to his poor literacy." He also stated that the inmates who had been assisting him with his case could not provide assistance any longer, and could not help him depose the defendants.

Meanwhile, the district court granted the motion to dismiss, dismissing the claims against two defendants without prejudice. The remaining defendants filed a response in opposition to the second motion for recruitment of counsel. They argued that Henderson's refusal to answer questions at his deposition was an attempt to indirectly obtain recruitment of counsel and that granting his motion would encourage other pro se prisoners to engage in the same type of improper conduct in an effort to obtain recruitment of counsel.

The magistrate judge denied the defendants' motion for discovery sanctions. Then the district judge denied the second motion for recruitment of counsel, ruling that "[t]he Court previously rejected plaintiffs request for counsel ... and sees no change in circumstances to revisit that prior decision. Plaintiff has demonstrated throughout this litigation that he is competent to represent himself in all aspects including discovery." Thereafter, Henderson filed a reply to the defendants' response to his motion for counsel, again requesting counsel.

After fact discovery was closed, Henderson moved for leave to file additional interrogatories, asserting that he 563*563 was not in any position to depose the defendants. He also moved to compel compliance with subpoenas he had issued seeking production of documents, including his medical records and master inmate file. The magistrate judge held a hearing and denied the motion for leave to file

additional interrogatories. His reasoning was twofold: Henderson had not submitted the interrogatories to be propounded and the motion was made after discovery was closed. The magistrate judge ordered the defendants to produce Henderson's medical records, including his master file to the extent it contained information relating to his case, and denied the motion to compel as moot. The judge also denied the motion to compel compliance with a subpoena issued to a nonparty because the subpoena was issued after discovery had closed.

The defendants moved for summary judgment, arguing that Henderson's lay opinion about what medical treatment he should have received for his chronic medical conditions and kidney disease was insufficient to find them deliberately indifferent. They highlighted Henderson's lack of knowledge regarding the proper treatment for his kidney disease and whether he had been taking renal medications. They also pointed to evidence that he had attended chronic clinics for his diabetes and hypertension every two or three months and the absence of any claim that any defendant refused to treat him for any chronic medical condition. Henderson responded by filing a motion to order the return of his legal documents to his jailhouse lawyer (Dobbey) so he could respond to the summary judgment motion. Henderson claimed that his legal documents were confiscated during a shakedown of Dobbey's cell.

Henderson also filed a third motion for recruitment of counsel and a motion for enlargement of time within which to respond to the summary judgment motion. The latter motion cited Henderson's inability to read and write and the confiscation of his legal documents from Dobbey's cell. Shortly thereafter, the district court granted the third motion for recruitment of counsel, recruited counsel to represent Henderson pursuant to the United States District Court for the Northern District of Illinois Trial Bar Pro Bono Program ("Pro Bono Program"), and extended the time for Henderson's summary judgment response.[1]

564*564 Counsel entered an appearance for Henderson and moved for an additional extension of time within which to respond to the summary judgment motion. The motion was granted. In opposing summary judgment, Henderson argued that October 2009 was the first time a medical professional told him he had kidney disease and that the Stateville doctors knew of his declining kidney health as early as February 2007 but did not provide him with the required medical care until his kidneys completely failed. Henderson acknowledged that he had received some medical care, but argued that there were questions about whether that care was

appropriate and whether it met the standards of medical practice and protocols. He relied on his observations of other inmates receiving different treatment for kidney disease and the failure to refer him to a nephrologist for more than two years after test results first revealed abnormalities.

In ruling on the summary judgment motion, the district court noted the evidence that Henderson attended clinics for diabetes and/or hypertension and that on several occasions between 2007 and January 2009, his blood and urine were tested. The court also noted that Henderson did not know whether he was taking medication for kidney disease during this time period. Finding that Henderson failed to produce any evidence that the treatment he received between February 2007 and September 2009 "was so far afield of accepted professional standards as to raise the inference that it was not based on medical judgment," the court granted the defendants summary judgment. Henderson now appeals the denials of his first two motions for recruitment of counsel.

## II. Discussion

Although "[t]here is no right to court-appointed counsel in federal civil litigation,"*Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir.2014), a district court has discretion to recruit counsel to represent an indigent plaintiff under 28 U.S.C. § 1915(e)(1). If the plaintiff has made a reasonable attempt to obtain counsel, the court asks, "given the difficulty of the case, does the plaintiff appear competent to litigate it himself?"*Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir.2010) (quoting *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir.2007) (en banc)) (internal quotation marks omitted). As we recently observed, deciding whether to recruit counsel "is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases." *Olson*, 750 F.3d at 711. Consequently, "[district courts are ... placed in the unenviable position of identifying, among the sea of people lacking counsel, those who need counsel the most." *Id.* This emphasizes the importance and need of such programs like the Pro Bono Program. See footnote 1, *supra.*

We review denials of motions for recruitment of counsel under § 1915(e)(1) for an abuse of discretion, *id.*, asking "not whether [the judge] was right, but whether he was reasonable." *Pruitt*, 503 F.3d at 659 (internal quotation mark omitted). Even if the district court abuses its discretion, we will not reverse unless there has been a showing of prejudice — that "there is a *reasonable likelihood* that the

presence 565*565of counsel would have made a difference in the outcome of the litigation." *Id.*

In deciding whether the district court abused its discretion, we ask "whether the difficulty of the case — factually and legally — exceeds the particular plaintiffs capacity as a layperson to coherently present it to the judge or jury himself." Pruitt,503 F.3d at 655. "We ... examine both the difficulties posed by the particular case and the capabilities of the plaintiff to litigate such a case." *Santiago*, 599 F.3d at 761.

The district court erred in assessing Henderson's competence to litigate his claims. "The inquiry into the plaintiffs capacity to handle his own case is a practical one, made in light of whatever relevant evidence is available on the question." *Pruitt*, 503 F.3d at 655. In its first denial of Henderson's request for counsel, the district court mentioned only that Henderson alleged "that he is not competent to litigate" and that he has a fifth grade education. It did not mention that he has a low IQ. (Although not in the record before the district court, we know that a psychologist testified in Henderson's state criminal case that Henderson has a "below average I.Q. of 64."*People v. Henderson*, 175 Ill.App.3d 483, 124 Ill.Dec. 934, 529 N.E.2d 1051, 1053 (1988).) Thus, the court failed to focus on Henderson's capabilities. Instead, it relied on the abilities of his jailhouse lawyer who had been preparing his filings for him, noting that they were "high quality for a pro se prisoner litigating his own case." (The jailhouse lawyer had only a GED and no formal legal training.) This is problematic for several reasons.

First, the fact that an inmate receives assistance from a fellow prisoner should not factor into the decision whether to recruit counsel. *See, e.g.,* *Pruitt*, 503 F.3d at 655("The question is whether the *plaintiff* appears competent to *litigate* his own claims, given their degree of difficulty, and this includes tasks that normally attend litigation....") (first emphasis added). The jailhouse lawyer likely would be unavailable to assist Henderson with certain aspects of discovery. For example, he could not attend or assist in Henderson's deposition. Henderson's second motion for recruitment of counsel points out that the inmate who had assisted him could not assist him in the discovery phase, specifically identifying the task of deposing the defendants. The district court seems to have overlooked this fact in denying the second motion for recruitment of counsel. *Compare* Feb. 22, 2011 Minute Entry 2 ("The Court understands plaintiffs assertion that his filings have been prepared by other inmates.") *with* Mar. 12, 2012 Minute Entry 1 ("The Court previously rejected

plaintiffs request for counsel ... and sees no change in circumstances to revisit that prior decision."). Furthermore, the jailhouse lawyer had no obligation to continue to assist Henderson (or to assist him at all).

If the district court had focused on Henderson's capabilities, it would have given greater consideration to his low IQ, his functional illiteracy and inexperience with civil litigation, his fifth grade education, and his reliance on the assistance of other inmates to present his claims. Henderson's limitations were exacerbated by his incarceration, which further restricted his ability to investigate the facts. *See, e.g.,*Junior v. Anderson, 724 F.3d 812, 815 (7th Cir.2013) ("[A] plaintiffs inability to investigate crucial facts by virtue of his being a prisoner ... is a familiar ground for regarding counsel as in-dispensable to the effective prosecution of the case."), and cases cited therein. Henderson was severely limited in his capacity to litigate his own case.

566*566 Moreover, the factual and legal complexity of this case necessitated appointment of counsel. "[C]ases involving complex medical evidence are typically more difficult for pro se defendants." *Santiago,* 599 F.3d at 761; *see also Pruitt,* 503 F.3d at 655-56 (same); *Greeno v. Daley,* 414 F.3d 645, 658 (7th Cir.2005)(concluding that pro se prisoner's case was "legally more complicated than a typical failure-to-treat claim because it require[d] an assessment of the adequacy of the treatment that [the plaintiff] did receive, a question that will likely require expert testimony"). And prisoners often face difficulty "when litigating constitutional claims that involve the state of mind of the defendant." *Santiago,* 599 F.3d at 761; *see also id.* at 762 (stating that presenting state-of-mind evidence "is one of the more challenging aspects of section 1983 litigation"); *Olson,* 750 F.3d at 711-12(acknowledging that "some state-of-mind issues may involve subtle questions too complex for pro se litigants" but rejecting the proposition that "state-of-mind questions are categorically too difficult for pro se litigants"); *Swofford v. Mandrell,* 969 F.2d 547, 552 (7th Cir.1992) (pointing out that the "difficult and subtle question of the state of mind required" for deliberate indifference is "'too complex' for a *pro se* plaintiff to understand") (citation omitted).

Henderson's case involves complex medical terms and concepts: kidney disease, end stage renal failure, creatine and blood urea nitrogen levels, "out of range" lab results, and dialysis, to name a few. This case also requires proof of the defendants' state of mind. To prevail on his Eighth Amendment deliberate indifference claim, Henderson would have to establish that defendants "knew of a substantial risk of harm to [him] and acted or failed to act in disregard of that risk." *Norfleet v.*

Webster, 439 F.3d 392, 396 (7th Cir.2006) (citations omitted). In addition, he would have to prove that the defendants' treatment of his kidney disease was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on ... [accepted professional] judgment." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir.2013) (citation and internal-quotation mark omitted). Expert medical evidence is required to prove this aspect of his claim. For example, as the district court noted, Henderson's only evidence that his kidney disease was improperly treated comes from his lab results, "which he, as a layman, clearly cannot properly interpret for a jury," and Henderson does not even know whether he has been taking renal medications all along for his kidney disease. In addition, as an inmate, Henderson lacked the ability to engage a medical expert. Given Henderson's capabilities, his incarceration, and the legal and factual complexities of the case, the district court abused its discretion by denying Henderson's first two requests for appointment of counsel.

And Henderson can show prejudice. As noted, prejudice in this context means "*areasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation." *Pruitt*, 503 F.3d at 659. "[Prejudice may be established by a litigant's poor performance before or during trial." *Id.* If the plaintiff "was incapable of engaging in any investigation[ ] or locating and presenting key witnesses or evidence" he can establish the requisite prejudice. *Santiago*, 599 F.3d at 765(quoting *Pruitt*, 503 F.3d at 659); *see also* *Junior*, 724 F.3d at 816 (reversing grant of summary judgment in favor of defendant and remanding to the court to recruit counsel for plaintiff where "[a]ll these gaps [in the record] cry out for 567*567 evidence that a lawyer could obtain but the plaintiff could not").

Because of his documented low IQ, functional illiteracy, poor education, inexperience with civil litigation, and incarceration, Henderson was incapable of obtaining the witnesses and evidence he needed to prevail on his claims. He offered no medical evidence in opposing the defendants' summary judgment motion because he had none. This was fatal to his claims: the district court granted the defendants summary judgment because Henderson "put forth [no] evidence from which a reasonable jury could conclude that the treatment provided to him ... was so far afield of accepted professional standards as to raise the inference that it was not based on medical judgment." Had counsel been recruited during the discovery phase, counsel could have served discovery requests; could have deposed the defendants, probing them about their subjective knowledge of Henderson's kidney health and the accepted

standards of care; could have deposed the hospital nephrologist regarding Henderson's medical condition and the proper treatment for kidney disease; and could have produced other evidence on the accepted standard of care, including an expert report, if necessary. Because appointed counsel could have obtained this evidence that Henderson could not, Henderson has shown prejudice.

Furthermore, Henderson was unable to identify three "John or Jane Doe" defendants who were dismissed for failure to prosecute. *See* Santiago, 599 F.3d at 766 (finding prejudice from failure to appoint counsel when plaintiff "was forced to drop Dr. John Doe as a defendant" because he "was unable to ascertain his identity"). Henderson did not obtain answers to interrogatories and a response to a third-party subpoena because he failed to serve them within the deadline for fact discovery. He did not depose any witnesses. A lawyer would have accomplished all these things. And a lawyer would have prepared Henderson for his own deposition, made objections to questions at his deposition, assisted him in reading exhibits, and even checked the transcript to ensure its accuracy, which Henderson could not do. *See* *Pruitt*, 503 F.3d at 660 (finding prejudice when attorney would have helped plaintiff "avoid common deposition pit-falls").

The defendants argue that counsel could have moved to reopen discovery or to reopen the deadline for expert disclosures in order to defeat the summary judgment motion. Henderson responds that counsel had no reason to believe that the district court was willing to reopen discovery. He points to the magistrate judge's denial of his pro se motion for additional discovery which was denied because discovery was closed. Given that counsel was appointed seven months after fact discovery closed, five months after expert discovery closed, and two months after the defendants filed their motion for summary judgment and the denial of Henderson's motion for additional discovery, we tend to agree that the court was not likely to grant a motion to reopen. *See* *Gutierrez v. AT & T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004) (finding no abuse of discretion in district court's decision to reject motion to reopen filed "after the close of discovery [and] in the midst of summary judgment briefing"); *Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir.2002) (affirming denial of motion for additional discovery to respond to summary judgment when requesting party "had more than ample opportunity to discover and present evidence"). Although Henderson's counsel was not expressly recruited for a limited purpose as in*Santiago*, 599 F.3d at 766, the proceedings in the district court suggest that counsel was recruited only to assist Henderson with formulating a response to 568*568 the pending summary judgment motion and, if necessary, at trial. And even if a motion to

reopen were granted, it seems likely that discovery would have been limited; the district court wasn't apt to rewind to the beginning of the case and allow a "do over" of the discovery phase. Finally, reopening discovery would not have cured Henderson's failure to identify and serve the John and Jane Doe defendants.

The record establishes that Henderson needed counsel and needed counsel's assistance at every phase of litigation. And there is a reasonable likelihood that the presence of counsel would have made a difference in the outcome of this case. In the sea of indigent litigants without counsel, Henderson should have stood out as someone who needed counsel the most.

# III. Conclusion

We REVERSE the district court's judgment and REMAND the case for further proceedings consistent with this opinion.

[1] Recognizing the number of indigent plaintiffs who cannot afford to pursue their cases in court and how challenging it is for judges to ask lawyers to volunteer their time to take these assignments, the United States District Court for the Northern District of Illinois created a committee composed of both judges and attorneys roughly thirty years ago to address this issue. The judges, adopting the committee's recommendation, created the Pro Bono Program. Any attorney who seeks admittance to the N.D. Ill. Trial Bar has the responsibility to serve as an appointed attorney in *pro se* civil or appellate matters pursuant to N.D. Ill. Local Rule 83.11(g). When the need arises, the clerk selects names at random from a panel of potential counsel. N.D. Ill. L.R. 83.35. Each panel member gives their relevant background, type of matter they would prefer being appointed to, and other relevant information. *Id.* Trial Bar admission fees are used to reimburse the attorneys for out-of-pocket expenses, such as paying for transcripts of depositions, travel expenses or hiring expert witnesses, up to $3,000, but the attorneys are not paid their fees for the pro bono work. This program has been successfully run for roughly three decades and it has been a great assistance in ensuring that indigent plaintiffs get access to justice. *See Synergy Assocs. v. Sun Biotechnologies, Inc.*, 350 F.3d 681, 684 (7th Cir.2003) (noting the program "ensure[s] that all deserving litigants, including those without financial means, have access to the counsel in the federal court system"); *see also* N.D. Ill. L.R. 83.35 (setting forth the requirements of the pro bono program). As discussed above, Henderson's counsel was appointed pursuant to the Pro Bono Program. Several other district courts in this circuit have similar procedures for requesting lawyers to represent indigent plaintiffs. *See, e.g.,* CD. Ill. L.R. 83.5(J); N.D. Ind. L.R. 83-7; S.D. Ind. L.R. 4-6. 83-7.

## Henderson v. Ghosh, 755 F. 3d 559 - Court of Appeals, 7th Circuit 2014

ReadHow citedSearch

### How this document has been cited

—reversing a district court's denial of request for counsel where the record reflected plaintiff's low IQ, functional illiteracy, and poor education
- in Kizer v. ALLEN COUNTY SHERIFF'S DEPARTMENT, 2014 and 6 similar citations

Consequently, it is clear that Moore is literate and has adequate communication skills, at least for purposes of representing himself.
- in Moore v. Fries, 2014 and 4 similar citations

"There is no right to court-appointed counsel in federal civil litigation," but a district court has discretion to recruit counsel to represent an indigent plaintiff under 28 USC § 1915 (e)(1).
- in Smith v. Chicago Transit Authority, 2015 and 3 similar citations

Moreover, it appears that Townsend has reasonably good communication skills, at least at a sufficient level to proceed pro se.
- in Townsend v. Wilson, 2015

760 F.3d 654 (2014)

# Leonard DEWITT, Plaintiff-Appellant,
# v.
# CORIZON, INC., et al., Defendants-Appellees.

No. 13-2930.

United States Court of Appeals, Seventh Circuit.

Submitted December 9, 2013.[*]
Decided July 25, 2014.

655*655 Leonard Dewitt, Indianapolis, IN, pro se.

Carol A. Dillon, Attorney, Bleeke Dillon Crandall, PC, Indianapolis, IN, for Defendant-Appellee.

Before CUDAHY, ROVNER, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Leonard Dewitt, a 51-year-old former inmate at the Indianapolis Re-Entry Educational Facility, challenges the grant of summary judgment against him in his deliberate indifference suit and also appeals the district court's denial of his three motions to recruit counsel. Because we find that the district court abused its discretion in denying the motions for recruitment of counsel, and those denials affected Dewitt's ability to develop and litigate his case, we will not reach the merits of the summary

judgment order. Therefore, we reverse and remand so that the court may recruit counsel and so Dewitt can conduct further discovery in order to litigate the case.

# I. BACKGROUND

Because the district court decided this case on a motion for summary judgment, we recite the facts in the light most favorable 656*656 to the nonmoving party, Dewitt. *See*Greeno v. Daley, 414 F.3d 645, 652 (7th Cir.2005). Dewitt's eye problems began in 2007 during his first incarceration at the Wabash Correctional Facility, which is a part of the Indiana Department of Corrections ("IDOC"). The IDOC contracts with Appellee Corizon, Inc. to provide medical care to Indiana prisoners. Dewitt submitted the first of many Requests for Healthcare to Corizon stating something was very wrong with his bloodshot left eye and his vision was "like looking through a dirty piece of plastic." Corizon's eye doctor diagnosed him with astigmatism and presbyopia (old-age nearsightedness causing slightly blurry vision), and prescribed eyeglasses.

Three months later, Dewitt submitted another Request for Healthcare after being transferred to a local work-release facility. IDOC medical staff contacted the Plainfield Correctional Facility to set up an appointment for him since the work-release facility did not have any specialists on staff. But Appellee Patty Wirth said that no appointment would be available for three months, so IDOC medical staff sent Dewitt to a prison physician who noted no obvious abnormalities in his left eye.

In May 2008, Dewitt was released on parole. A doctor determined that Dewitt had a form of glaucoma in his left eye and he was advised in late 2008 to undergo laser-eye surgery to prevent any future attacks. He underwent a surgical procedure on his right eye in early 2009 to remove part of the iris to decrease eye pressure. His left eye continued to have higher than normal intra-ocular pressure.

Dewitt was again incarcerated in 2009, this time at the Putnamville Correctional Facility, where he filed another Request for Healthcare, noting exceptional irritation in his left eye. He was referred to Wishard Hospital where an ophthalmologist prescribed medicated eye drops in order to decrease the pressure. The ophthalmologist told Dewitt if they did not work, he might need to have the eye or portions of it removed. The drops did not work, and, believing he had no real alternative, Dewitt submitted another Request for Healthcare in November to have his left eye removed.

Dewitt received treatment both inside and outside the facility over the next several months, and filed another Request for Healthcare to have his eye removed in February 2011. Corizon's regional medical director, Appellee Dr. Michael Mitcheff, viewed removal as an extreme last resort and suggested a more conservative approach, including medicated eye drops and pain medication. Dewitt was prescribed medication, including a 90-day prescription for Vicodin by defendant Dr. Naveen Rajoli, ultimately received a glaucoma evaluation at the Midwest Eye Institute and eye removal was recommended. In May 2012, he underwent surgery to remove part of his left eye's ciliary body.

Dewitt filed suit under 42 U.S.C. § 1983 against Corizon, Wirth, and Mitcheff, asserting that they were deliberately indifferent to his glaucoma condition. He also sued Dr. James Stewart and Dr. Rajoli, but Stewart was dismissed from the suit and Dewitt does not mention Rajoli in his brief. In April 2012, Dewitt moved for assistance of counsel, stating his vision problems combined with his tenth-grade education made it difficult for him to conduct discovery and litigate his case. The district court denied his request, finding that Dewitt's claims were not overly complex or meritorious, that Dewitt was familiar with his claims and able to present them, and he was "within the spectrum of most indigent parties." Six months later, Dewitt moved again for assistance of counsel, repeating his earlier statements. He also complained that Appellees had abused 657*657 discovery rules and delayed their responses. The court denied this request using the same language as the first denial and without addressing the alleged discovery abuses.

After Appellees moved for summary judgment, Dewitt filed a "reply" to Appellees' reply in support of summary judgment, and a request under Federal Rule of Civil Procedure 56(f) (now Rule 56(d)) for further discovery. He again begged the court to recruit counsel so he could conduct discovery. The district court did not address Dewitt's Rule 56(d) motion, but granted Appellees' motion for summary judgment, in part, because Dewitt failed to show Corizon had any "official policy or custom" to delay medical treatment and because Dr. Mitcheff exercised reasoned professional judgment. Dewitt now appeals.

## II. ANALYSIS

Though Dewitt argues the merits of the summary judgment order, we do not reach that issue because we hold that Dewitt should have had an attorney throughout the litigation. There is no right to recruitment of counsel in federal civil litigation, but a

district court has discretion to recruit counsel under 28 U.S.C. § 1915(e)(1). *See*Henderson v. Ghosh, 755 F.3d 559, No. 13-2035, 2014 WL 2757473, at *4 (7th Cir. June 18, 2014) (per curiam). If an indigent plaintiff has made a reasonable attempt to obtain counsel and then files a motion for recruitment of counsel, the district court should ask "whether the difficulty of the case — factually and legally — exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir.2007) (en banc). We acknowledge this is a "difficult decision" since "[a]lmost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases." *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir.2014). So we review the denial of the recruitment of counsel for an abuse of discretion and will reverse only if the plaintiff was prejudiced by the denial — *e.g.*, if there is a reasonable likelihood that the recruitment of counsel would have made a difference in the outcome of the litigation. *See* *Santiago v. Walls*, 599 F.3d 749, 765 (7th Cir.2010). In so deciding, our case law is clear that a plaintiff can be prejudiced by the lack of counsel pretrial just as easily as during the briefing or trial itself. *See* *id.*at 765 (noting prejudice when plaintiff "was incapable of engaging in any investigation[] or locating and presenting key witnesses or evidence" (quoting *Pruitt*,503 F.3d at 659)); *see also* Henderson, 755 F.3d at 566-67, 2014 WL 2757473 at *7(finding prejudice where plaintiff "was incapable of obtaining the witnesses and evidence he needed to prevail on his claims"); *Bracey v. Grondin*, 712 F.3d 1012, 1017 (7th Cir.2013) ("Complexities anticipated (or arising) during discovery can justify a court's decision to recruit counsel").

The first question, then, is whether the district court abused its discretion in denying the motions for recruitment of counsel. In his first motion, Dewitt requested the recruitment of counsel because of his tenth-grade education, the fact that he was incarcerated and unable to investigate and discover relevant facts. He also pointed out that he was "now totally blind in his left eye and the vision in his right eye is impaired." He discussed the medical complexity of his case, his reliance on "jailhouse lawyers," and his inability "to comprehend with any legal understanding, the discovery rules and the Defendants [sic] motions." The court denied the motion and stated that "the claims by the plaintiff are not of sufficient complexity or merit as to surpass the plaintiff's ability to 658*658 properly develop and present them," and that "the plaintiff is within the spectrum of `most indigent parties' because he has and will have a meaningful opportunity to present his claim, he has demonstrated familiarity with his claims and the ability to present them." The court stated that it had considered the complexity of the case and Dewitt's ability to litigate the case —

without delving into any of Dewitt's personal characteristics or the specifics of the case — before denying the motion.

The court abused its discretion by failing to explain its reasoning and failing to address all the relevant arguments Dewitt raised. For example, the court characterized Dewitt as fitting within the spectrum of most pro se litigants and said it had considered his personal characteristics, but it did not identify those characteristics. However, the court did not address the challenges that Dewitt, as a blind and indigent prisoner with a tenth-grade education and no legal experience, faced in being able to investigate crucial facts and depose witnesses, doctors, and other allegedly resistant prison personnel. *See* Pruitt, 503 F.3d at 655 (noting the court "should review any information submitted in support of the request for counsel, as well as the pleadings, communications from, and any contact with the plaintiff");*see also* Navejar v. Iyiola, 718 F.3d 692, 696 (7th Cir. 2013) (noting judge should have considered plaintiff's "limited education, mental illness, language difficulties, and lack of access to fellow prisoners or other resources for assistance after his transfer from Stateville"). Moreover, the court's statement that Dewitt "has demonstrated familiarity with his claims and the ability to present them" does not demonstrate that the district court specifically examined Dewitt's personal ability to litigate the case, versus the ability of the "jailhouse lawyer" who Dewitt said in his motion was helping him. The analysis should be of the *plaintiff's* ability to litigate *his own* claims, and the "fact that an inmate receives assistance from a fellow prisoner should not factor into the decision whether to recruit counsel." Henderson, 755 F.3d at 565, 2014 WL 2757473 at *5.

Nor did the court explain why the claims were not of "sufficient complexity" to merit recruitment of counsel. In fact, the case presents complicated medical matters, involves varying recommended courses of treatment by numerous physicians, and required discovery into what constitutes reasonable care for medical professionals. Though not every deliberate indifference case is so complex and beyond the individual plaintiff's capacity as to warrant the recruitment of counsel, this one was.*See* Henderson, 755 F.3d at 566-67, 2014 WL 2757473 at **6-7 (noting case required recruitment of counsel because it "involves complex medical terms and concepts," requires proof of the "defendants' state of mind" and proof of doctor's knowledge of a substantial risk of harm and disregard of that risk). *But see, e.g.,*Olson, 750 F.3d at 711-12 (holding no abuse of discretion in denying recruitment of counsel motion for medical indifference case when disputed issue was whether defendant knew of plaintiff's physical condition); Romanelli v. Suliene, 615 F.3d 847,

854 (7th Cir.2010) (finding no abuse of discretion in denying motion in medical indifference case when neither side contested that plaintiff was ill). We are aware that the appointment of counsel in civil cases can pose challenges for judges, who ask lawyers to volunteer their time to take these assignments, and the attorneys who are asked by the judges and who ultimately take the assignments. As a way to combat those issues, we again highlight the work done by the Pro Bono Program for the United States District Court for the Northern District of Illinois Trial Bar, which mandates that members of the Trial Bar serve as an appointed attorney in pro se civil or appellate matters. 659*659 *See* N.D. Ill. L.R. 83.35; N.D. Ill. L.R. 83.11(g). *See also* Henderson, 755 F.3d at 563, 2014 WL 2757473 at *3 n. 1; *Synergy Assocs. v. Sun Biotechnologies, Inc.*, 350 F.3d 681, 684 (7th Cir.2003). While other districts in this circuit have similar procedures, *see* C.D. Ill. L.R. 83.5(J), N.D. Ind. L.R. 83-7, S.D. Ind. 4-6, 83-7, the mandatory nature of the Northern District of Illinois's program ensures that judges are not put in the position of repeatedly asking the same counsel to take on appointments, and attorneys are not put in the position of being asked time and again to take cases by the judges in front of whom they appear on a regular basis.

In Dewitt's second motion to recruit counsel, Dewitt made basically the same arguments while adding that "Defendants are intentionally abusing the discovery rules, they have delayed their responses to the Plaintiff's interrogatories so as to gain an upper hand with the closing of the deadlines the Court has imposed, and [are] now claiming that they have no obligation to answer further interrogatories." The court denied Dewitt's motion without addressing this new argument. Though the district court need not address every point raised in recruitment motions, it must address those that bear directly on whether "the difficulty of the case — factually and legally — exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Pruitt*, 503 F.3d at 655. That includes whether Dewitt was capable of putting a stop to alleged discovery abuses. *See, e.g.*, Henderson, 755 F.3d at 566, 2014 WL 2757473 at *6 (finding court erred by not considering substantive issue, namely appellant's personal capabilities, that was raised in recruitment motion).

Moreover, in his Federal Rule of Civil Procedure 56(f) (now 56(d)) "reply" to Appellees' reply in support of summary judgment, Dewitt requested more time for discovery as well as the recruitment of counsel to aid him in conducting such discovery. Although this was not a separate formal motion requesting counsel, the court should have addressed it. *See* *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("[W]e have insisted that the pleadings prepared by

prisoners who do not have access to counsel be liberally construed"); Santiago,599 F.3d at 765 (noting "the magistrate judge's methodological lapse in failing to give full consideration to each factor constitutes an abuse of discretion"); *Pruitt*, 503 F.3d at 658.

Finding that the district court abused its discretion does not end our inquiry. We must now determine whether Dewitt was prejudiced. Based on the reasons the court gave in granting the motion for summary judgment, we find Dewitt was. For example, the district court determined that Dr. Mitcheff exercised "reasoned professional judgment" inconsistent with deliberate indifference. But could a lawyer have helped Dewitt present sufficient facts to create a genuine issue about why the doctor declined to follow a specialist's recommendations or advised a continuation of ineffective treatments that prolonged his pain? We think there is a reasonable likelihood counsel could have aided here and made a difference in the outcome. *See*Greeno, 414 F.3d at 658 (holding case was "legally more complicated than a typical failure-to-treat claim because it require[d] an assessment of the adequacy of the treatment that [plaintiff] did receive, a question that will likely require expert testimony"); *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir.2011) (analyzing complexities of deliberate indifference claims).

Counsel also could have assisted Dewitt in addressing his concerns about the alleged discovery violations. Dewitt filed a 660*660 motion to compel, to which Appellees responded that they had replied to all outstanding discovery. The court found the issue moot based on Appellees' response and denied the motion. Yet, two months later, Dewitt stated in his second motion for recruitment of counsel that Appellees were not complying with all discovery requests. That was still a problem when Dewitt filed his Rule 56(f) request for more time to conduct discovery. We do not make any determinations on the merits of Dewitt's allegations relating to discovery abuses, but find that had Dewitt had counsel to navigate through discovery, there is a reasonable likelihood that he could have better advocated his position and changed the outcome of the litigation. *See* *Santiago*, 599 F.3d at 765-66 (noting Appellant's "later attempts to conduct relevant discovery were not successful" and "[t]he treatment afforded him by the defendants was not, it is safe to say, the same treatment that would have been afforded a member of the bar").

Finally, we observe the district court disregarded Dewitt's request under Federal Rule of Civil Procedure 56(f) seeking more time to conduct discovery before the court ruled on Appellees' motion for summary judgment. While a district court has broad

discretion to deny such motions, *see* *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir.2000), it is improper to decide summary judgment without first ruling on a pending 56(f) motion. *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir.2007).

# III. CONCLUSION

Accordingly, we REVERSE the district court's denial of Appellant's motions for recruitment of counsel, VACATE the district court's judgment in favor of Appellees, and REMAND for proceedings consistent with this order.

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

## Dewitt v. Corizon, Inc., 760 F. 3d 654 - Court of Appeals, 7th Circuit 2014

ReadHow citedSearch

### How this document has been cited

—reversing a district court's denial of request for counsel pertaining to "a blind and indigent prisoner with a tenth-grade education and no legal experience" in a case involving complicated medical matters
- in McClure v. HNR BLOCK, 2015 and 4 similar citations

However, even if the circumstances of Plaintiff's case convinced the Court to engage in such a search, "[t] here is no right to recruitment of counsel in federal civil litigation, but a district court has discretion to recruit counsel under 28 USC § 1915 (e)(1)."
- in Tippins v. Caruso, 2015 and 3 similar citations

"If an indigent plaintiff has made a reasonable attempt to obtain counsel and then files a motion for recruitment of counsel, the district court should ask whether the difficulty of the case-factually and legally-exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself."
- in Smith v. Chicago Transit Authority, 2015 and 2 similar citations

It is clear from Bady's written submissions and court appearances that he is literate and has adequate communication skills, at least for purposes of representing himself.
- in Bady v. Bennett, 2014 and 2 similar citations

Moreover, it appears that Townsend has reasonably good communication skills, at least at a sufficient level to proceed pro se.

- in Townsend v. Wilson, 2015 and one similar citation

In this case, Mr. Smith has not demonstrated that he has made a "reasonable attempt to obtain counsel."
- in Smith v. Chicago Transit Authority, 2015

Although medical care claims have the potential to be complex and sometimes require expert testimony, it is not yet clear that plaintiff's claims will have those features, particularly because the allegations in his complaint are the bare minimum necessary to satisfy federal pleading standards and there has been little factual development in the case since then.
- in Theus v. BLASSIUS, 2015

—some medical care claims are "so complex and beyond the individual plaintiff's capacity as to warrant the recruitment of counsel"; others are not
- in Theus v. BLASSIUS, 2015

The defendants' motion for summary judgment was not extremely complicated; it discussed some medical evidence, such as the plaintiff's use of over-the-counter pain medications and Mr. Padilla's glasses prescription, but even that evidence was easy to understand for the reasons used by the defendants, and was ultimately of little importance to the decision.
- in Padilla v. Ruck, 2015

# A. 3.191. Speedy Trial

RULE 3.191. SPEEDY TRIAL

**(a) Speedy Trial without Demand. Except as otherwise provided by this rule, and subject to the limitations imposed under subdivisions (e) and (f), every person charged with a crime shall be brought to trial within 90 days of arrest if the crime charged is a misdemeanor, or within 175 days of arrest if the crime charged is a felony. If trial is not commenced within these time periods, the defendant shall be entitled to the appropriate remedy as set forth in subdivision (p). The time periods established by this subdivision shall commence when the person is taken into custody as defined under subdivision (d). A person charged with a crime is entitled to the benefits of this rule whether the person is in custody in a jail or correctional institution of this state or a political subdivision thereof or is at liberty on bail or recognizance or other pretrial release condition. This subdivision shall cease to apply whenever a person files a valid demand for speedy trial under subdivision (b).**

**(b) Speedy Trial upon Demand. Except as otherwise provided by this rule, and subject to the limitations imposed under subdivisions (e) and (g), every person charged with a crime by indictment or information shall have the right to demand a trial within 60**

**days, by filing with the court a separate pleading entitled —Demand for Speedy Trial,‖ and serving a copy on the prosecuting authority.**

**(1) No later than 5 days from the filing of a demand for speedy trial, the court shall hold a calendar call, with notice to all parties, for the express purposes of announcing in open court receipt of the demand and of setting the case for trial.**
**(2) At the calendar call the court shall set the case for trial to commence at a date no less than 5 days nor more than 45 days from the date of the calendar call.**
**(3) The failure of the court to hold a calendar call on a demand that has been properly filed and served shall not interrupt the running of any time periods under this subdivision.**
**(4) If the defendant has not been brought to trial within 50 days of the filing of the demand, the defendant shall have the right to the appropriate remedy as set forth in subdivision (p).**

**(c) Commencement of Trial. A person shall be considered to have been brought to trial if the trial commences within the time herein provided. The trial is considered to have commenced when the trial jury panel for that specific trial is sworn for voir dire examination or, on waiver of a jury trial, when the trial proceedings begin before the judge.**

**(d) Custody. For purposes of this rule, a person is taken into custody (1) when the person is arrested as a result of the conduct or criminal episode that gave rise to the crime charged, or (2) when the person is served with a notice to appear in lieu of physical arrest.**

**(e) Prisoners outside Jurisdiction. A person who is in federal custody or incarcerated in a jail or correctional institution outside the jurisdiction of this state or a subdivision thereof, and who is charged with a crime by indictment or information issued or filed under the laws of this state, is not entitled to the benefit of this rule until that person returns or is returned to the jurisdiction of the court within which the Florida charge is pending and until written notice of the person's return is filed with the court and served on the prosecutor. For these persons, the time period under subdivision (a) commences on the date the last act required under this subdivision occurs. For these persons the time period under subdivision (b) commences when the demand is filed so long as the acts required under this subdivision occur before the filing of the demand. If the acts required under this subdivision do not precede the filing of the demand, the demand is invalid and shall be stricken upon motion of the prosecuting attorney. Nothing in this rule shall affect a prisoner's right to speedy trial under law.**

**(f) Consolidation of Felony and Misdemeanor. When a felony and a misdemeanor are consolidated for disposition in circuit court, the misdemeanor shall be governed by the same time period applicable to the felony.**

**(g) Demand for Speedy Trial; Accused Is Bound. A demand for speedy trial binds the accused and the state. No demand for speedy trial shall be filed or served unless the accused has a bona fide desire to obtain a trial sooner than otherwise might be provided. A demand for speedy trial shall be considered a pleading that the accused is available for trial, has diligently investigated the case, and is prepared or will be prepared for trial within 5 days. A demand filed by an accused who has not diligently investigated**

the case or who is not timely prepared for trial shall be stricken as invalid on motion of the prosecuting attorney. A demand may not be withdrawn by the accused except on order of the court, with consent of the state or on good cause shown. Good cause for continuances or delay on behalf of the accused thereafter shall not include nonreadiness for trial, except as to matters that may arise after the demand for trial is filed and that reasonably could not have been anticipated by the accused or counsel for the accused. A person who has demanded speedy trial, who thereafter is not prepared for trial, is not entitled to continuance or delay except as provided in this rule.

(h) Notice of Expiration of Time for Speedy Trial; When Timely. A notice of expiration of speedy trial time shall be timely if filed and served after the expiration of the periods of time for trial provided in this rule. However, a notice of expiration of speedy trial time filed before expiration of the period of time for trial is invalid and shall be stricken on motion of the prosecuting attorney.

(i) When Time May Be Extended. The periods of time established by this rule may be extended, provided the period of time sought to be extended has not expired at the time the extension was procured. An extension may be procured by:

(1) stipulation, announced to the court or signed in proper person or by counsel, by the party against whom the stipulation is sought to be enforced;
(2) written or recorded order of the court on the court's own motion or motion by either party in exceptional circumstances as hereafter defined in subdivision (l);
(3) written or recorded order of the court with good cause shown by the accused;
(4) written or recorded order of the court for a period of reasonable and necessary delay resulting from proceedings including but not limited to an examination and hearing to determine the mental competency or physical ability of the defendant to stand trial, for hearings on pretrial motions, for appeals by the state, for DNA testing ordered on the defendant's behalf upon defendant's motion specifying the physical evidence to be tested pursuant to section 925.12(2), Florida Statutes, and for trial of other pending criminal charges against the accused; or
(5) administrative order issued by the chief justice, under Florida Rule of Judicial Administration 2.205(a)(2)(B)(iv), suspending the speedy trial procedures as stated therein.

(j) Delay and Continuances; Effect on Motion. If trial of the accused does not commence within the periods of time established by this rule, a pending motion for discharge shall be granted by the court unless it is shown that:

(1) a time extension has been ordered under subdivision (i) and that extension has not expired;
(2) the failure to hold trial is attributable to the accused, a codefendant in the same trial, or their counsel;
(3) the accused was unavailable for trial under subdivision (k); or
(4) the demand referred to in subdivision (g) is invalid.
If the court finds that discharge is not appropriate for reasons under subdivisions (j)(2),

**(3), or (4), the pending motion for discharge shall be denied, provided, however, that trial shall be scheduled and commence within 90 days of a written or recorded order of denial.**

**(k) Availability for Trial. A person is unavailable for trial if the person or the person's counsel fails to attend a proceeding at which either's presence is required by these rules, or the person or counsel is not ready for trial on the date trial is scheduled. A person who has not been available for trial during the term provided for in this rule is not entitled to be discharged. No presumption of nonavailability attaches, but if the state objects to discharge and presents any evidence tending to show nonavailability, the accused must establish, by competent proof, availability during the term.**

**(l) Exceptional Circumstances. As permitted by subdivision (i) of this rule, the court may order an extension of the time periods provided under this rule when exceptional circumstances are shown to exist. Exceptional circumstances shall not include general congestion of the court's docket, lack of diligent preparation, failure to obtain available witnesses, or other avoidable or foreseeable delays. Exceptional circumstances are those that, as a matter of substantial justice to the accused or the state or both, require an order by the court. These circumstances include:**

**(1) unexpected illness, unexpected incapacity, or unforeseeable and unavoidable absence of a person whose presence or testimony is uniquely necessary for a full and adequate trial;**
**(2) a showing by the state that the case is so unusual and so complex, because of the number of defendants or the nature of the prosecution or otherwise, that it is unreasonable to expect adequate investigation or preparation within the periods of time established by this rule;**
**(3) a showing by the state that specific evidence or testimony is not available despite diligent efforts to secure it, but will become available at a later time;**
**(4) a showing by the accused or the state of necessity for delay grounded on developments that could not have been anticipated and that materially will affect the trial;**
**(5) a showing that a delay is necessary to accommodate a codefendant, when there is reason not to sever the cases to proceed promptly with trial of the defendant; and**
**(6) a showing by the state that the accused has caused major delay or disruption of preparation of proceedings, as by preventing the attendance of witnesses or otherwise.**

**(m) Effect of Mistrial; Appeal; Order of New Trial. A person who is to be tried again or whose trial has been delayed by an appeal by the state or the defendant shall be brought to trial within 90 days from the date of declaration of a mistrial by the trial court, the date of an order by the trial court granting a new trial, the date of an order by the trial court granting a motion in arrest of judgment, or the date of receipt by the trial court of a mandate, order, or notice of whatever form from a reviewing court that makes possible a new trial for the defendant, whichever is last in time. If a defendant is not brought to trial within the prescribed time periods, the defendant shall be entitled to the appropriate remedy as set forth in subdivision (p).**

(n) Discharge from Crime; Effect. Discharge from a crime under this rule shall operate to bar prosecution of the crime charged and of all other crimes on which trial has not commenced nor conviction obtained nor adjudication withheld and that were or might have been charged as a result of the same conduct or criminal episode as a lesser degree or lesser included offense.

(o) Nolle Prosequi; Effect. The intent and effect of this rule shall not be avoided by the state by entering a nolle prosequi to a crime charged and by prosecuting a new crime grounded on the same conduct or criminal episode or otherwise by prosecuting new and different charges based on the same conduct or criminal episode whether or not the pending charge is suspended, continued, or is the subject of entry of a nolle prosequi.

(p) Remedy for Failure to Try Defendant within the Specified Time.
(1) No remedy shall be granted to any defendant under this rule until the court has made the required inquiry under subdivision (j).
(2) At any time after the expiration of the prescribed time period, the defendant may file a separate pleading entitled —Notice of Expiration of Speedy Trial Time and serve a copy on the prosecuting authority.
(3) No later than 5 days from the date of the filing of a notice of expiration of speedy trial time, the court shall hold a hearing on the notice and, unless the court finds that one of the reasons set forth in subdivision (j) exists, shall order that the defendant be brought to trial within 10 days. A defendant not brought to trial within the 10-day period through no fault of the defendant, on motion of the defendant or the court, shall be forever discharged from the crime.

B. GENE SALSER,
Petitioner,
vs.
STATE OF FLORIDA,
Respondent.

[February 11, 19931
PER CURIAM.
We have for review Salser v. State, 582 So.2d 12 (Fla. 5th DCA 1991), based on apparent conflict with State v. Tait, 387 So.2d 338 (Fla. 1980). Upon further review we have determined that conflict does not exist and that there is no other valid basis for jurisdiction here. Accordingly, the petition for review was improvidently granted and is hereby dismissed.
It is so ordered.
OVERTON, McDOrU'ALD, GRIMES and HARDINC, JJ., concur.
ROGAN, J., dissents with an opinion, in which BARKETT, C.J. and SHAW, J., concur.
NO MOTION FOR REHEARING WILL BE ALLOWED.


1 .

KOGAN, J. , dissenting.
On February 17, 1989, Gene Salser made his first appearance in court to be arraigned on charges of armed robbery.
At this time, a public defender was appointed to represent him,
although the attorney did not appear with Salser at this time.
The attorney later sent him a letter telling Salser to contact the public defender's office, but Salser did not respond until September that same year.
On August 10, 1989, Salser filed a pro se motion for discharge under the speedy trial rule' on grounds that at least
175 days had passed since his arrest. On August 15, 1989, the state moved to strike Salser's motion on grounds he could only
*
make the motion through his court-appointed public defender.
hearing was held in this matter until November 6, 1989, at which
time the trial court granted the state's request and struck Salser's motion as a nullity. The trial court rejected Salser's argument (through counsel) that a hearing should have been held
within five days of Salser's pro se motion for discharge and the
No
See Fla.R, Crim. P. 3.191.

* I recognize that the state argues that nothing in the record shows that the speedy-trial motion was filed with the trial court. However, the fact that the state moved to strike Salser's motion clearly shows that the trial court's attention was called to this matter. Moreover, I find no indication that the state attempted to raise this issue before the district court. Accordingly, even if the state's assertions are correct, the state has waived the issue for purposes of appeal.



trial scheduled at that time. See Fla. R. Crim. P. 3.191(i)(3) (1984).

Based on the facts before us, it is clear to me that Salser would have been entitled to release under the speedy trial rule had his motion been made through counsel. Fla. R. Crim. P. 3.191. The sole question before us, then, is whether the motion could be treated as a nullity simply because it was filed by Salser himself at a time when he had court-appointed counsel. In the past the Court has held that

> [w]hen the accused is represented by counsel, affording him the privilege of addressing the court or the jury in person is a matter for the sound discretion of the court.

State v. Tait, 387 So. 2d 338, 340 (Fla. 1980) (emphasis added). As the Second District has noted,

> the right of the defendant to speak for himself when represented by counsel is subject to restriction by the trial court in the exercise of its power to prescribe the manner in which the trial will proceed.

Thompson v. State, 194 So. 2d 649, 650 (Fla. 2d DCA 1967) (emphasis added). Based on such reasoning, the Fourth District has held that an appellant has no absolute right to file a brief separate and apart from the one prepared by court-appointed counsel. "To permit this," reasoned the court,

> would clearly interfere with the time schedules and the filing and service of papers. Such

practice would frustrate and confuse the appellate process and administration of justice.
Powell v. State, 206 So.26 47,48 (Fla. 4th DCA 1968).



I believe that the rule established in the above line of cases is not so broad as the majority tacitly assumes by denying jurisdiction. Tait clearly was concerned with a defendant's desire to duplicate counsel's efforts by separately addressing the court or jury during trial, thereby disrupting or delaying the proceedings pointlessly. Powell addressed an appellant's desire to duplicate counsel's effort in filing a brief, thereby causing disruption of the appellate process. While some of the language in Tait can be construed overbroadly to apply to other factual settings, I believe that this extends the rule in the cases into inappropriate settings not actually intended. In sum, Tait is concerned with *pro se* tactics that cause disruption and duplication of effort. The rule in Tait does not extend, and was not intended to extend, to nondisruptive, nonduplicative pro se efforts, such as the motion filed by Salser below. On that basis, I would find conflict and accept jurisdiction, because the district court has misapplied and thus is in conflict with Tait.
Art. V, 8 3(b)(3), Fla. Const,

On the merits, I do not find that the trial court in reviewing a pro *se* speedy-trial motion will face the broader problem of judicial disruption upon which Tait, Thompson, and Powell clearly rested. It was duplication of the defense effort likely to cause disruption that was the focus of these earlier opinions. When such duplication is being urged in the guise of a constitutional right, the trial court properly has discretion to deny a defendant's request. A defendant does not have an



absolute right to speak when defense counsel already has spoken or stands ready and diligent to speak at the proper times. Nor

does a defendant have an absolute right to reargue what already has been argued.

Here, however, we face an entirely different situation. This record strongly suggests that counsel's contacts with Salser prior to the filing of the speedy-trial motian were minimal OK nonexistent. Counsel certainly failed to compute the speedytrial period that Salser so promptly identified. Here, in other words, there was nothing for Salser to duplicate and no threat of disruption. Accordingly, I believe the trial court exceeded its discretion in failing to conduct the speedy-trial hearing in a timely manner and then later holding that Salser's motion was a nullity. I would hold that a trial court may not disregard an otherwise valid pro se speedy-trial motion when defense counsel obviously has neglected to make the filing.5 Accord State v,

Part of the problem apparently arose from the fact that Salser had been moved to a jail in another county on separate charges. The recard suggests that Salser's whereabouts did not become known to his counsel until after the pro se motian was filed. I also note that, in one of his pro se pleadings, Salser complained to the trial court that his court-appointed counsel "has failed to return calls or correspondence to defendant's letters and calls, [and] defendant believes [counsel] has withdrawn from his case as he indicated he would do in his letter dated July 25, 1989." The letter referenced here is in the record and does in fact make the statement paraphrased by Salser.

Indeed, Salser's motion caused no more disruption than would have occurred had counsel filed the proper motion.

I also am not persuaded by the state's argument that Rule of



Smiley, 529 So. 2d 349 (Fla. 1st DCA 1988). Because Salser's pro se motion was valid, the trial court lost jurisdiction of this cause when the hearing on the motion and the scheduling of trial were not completed in a timely manner.6

3*191(i); Ariza v. Cycmanick, 548 So. 2d 304 (Fla. 5th DCA 1989).

Fla. R. Crim. P.

Of course, I recognize that there may be situations in which defendants believe they have detected an omission made by counsel and desire to take actions that could be disruptive. For example, a defendant might develop a desire to make unfounded oral objections during trial, apart from those made by counsel.

To the extent such disruption is more likely, and especially in proceedings before the jury, the trial court's discretion to curb the defendant's behavior increases. In appropriate cases, the trial court may be obligated to treat the defendant's behavior as a claim of incompetency of counsel. If so, a hearing may be warranted under the standard adopted in Hardwick v. State, 521 So.2d 1071, 1074 (Fla.), cert. denied, 488 U.S. 871, 109 S. Ct.

Judicial Administration 2.060 requires a person such as Salser to obtain the signature of the attorney on the pleading before filing it in court. By its own terms, rule 2.060 applies only to attorneys, not to persons acting pro se. This is true even if a person acting pro se happens to have court-appointed counsel. Fla. R. Jud. Admin. 2.060.

Under the rule, the hearing must be within five days of the motion for discharge and trial must be scheduled within ten days of the hearing unless the trial court specifically finds that the case falls within a valid exception to the rule. Fla. R. Crim. P. 3.191(i)(3)(1984). Thus, the trial court here lost jurisdiction to try Salser fifteen days after the motion for discharge was made.



185, 102 L. Ed. 2d 154 (1988). But where, as here, there is little or no possibility of disruption and no duplication of effort, the trial court's discretion is much more limited. Salser's motion for discharge under the speedy trial rule should

have been granted because the trial court's failure to conduct a speedy-trial hearing within the requisite time limits deprived it of jurisdiction over Salser. Ariza.

In so concluding, 1 distinguish Dickey v. McNeal, 445 So. 2d 692 (Fla. 5th DCA 1984), and Carter v. State, 509 So. 2d 1126 (Fla. 5th DCA 1987), because they dealt with demands for speedy trial under rule 3.191(c) and not a motion for discharge for failure to honor the time limits specified in rule 3.191(a)(1), as occurred here. Under the speedy trial rule, a demand for trial within sixty days can be reviewed for spuriousness7 upon a proper motion by the state.8

Notwithstanding this right, a defendant--prepared or not--has the right to be brought to trial within 175 days for a felony and

Fla. R. Crim. P. 3.191(~)(1984).

ninety days for a misdemeanor, subject to limited exceptions. Fla. R.Crim.P. 3.191(a)(1), (d),(i)(1984). There thus is no inquiry for spuriousness in the latter instance.

"Spuriousness" exists for present purposes when the defendant will not be prepared for trial within five days of the demand.

Fla. R. Crim. P. 3.191(~)(1984).

1987), whether such a motion was made.

It is unclear in Carter v. State, 509 So.2d 1126 (Fla. 5th DCA



For the foregoing reasons, 1 would accept jurisdiction, disapprove the opinion under review, and remand for further proceedings. In any event, I note that the denial of jurisdiction by the majority sets no precedent and effectively leaves the issues presented in this case unresolved.

BARKETT, C.J. and SHAW, J., concur.

9

I find the result reached in State v. Srniley, 529 So. 2d 349 (Fla.1st DCA 1988), generally consistent with the views I have expressed here, although the dicta in that opinion regarding pro se motions under Rule of Criminal Procedure 3.191 would need to

be disapproved. I distinguish Beverly v. State, 516 So. 2d 30 (Fla. 1st DCA 1987), because the right to speedy trial was waived there. Finally, I would disapprove the opinion in Johnson v. State, 501 So. 2d 94 (Fla. 1st DCA 1987), to the extent it conflicts with my views here.

-8-

Application for Review of the Decision of the District Court of Appeal - Constitutional Construction

Fifth District - Case No. 90-405
(Seminole County)

James B. Gibson, Public Defender; and Paolo G. Annino and Michael S. Becker, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,
for Petitioner

Robert A. Butterworth, Attorney General and David S. Morgan, Assistant Attorney General, Daytona Beach, Florida,
for Respondent

-9-

**RESPECTFULLY SUBMITTED,**

**PRESTON LEONARD SCHOFIELD PRO SE,**

**PRESTONSCHOFIELD@YAHOO.COM**

**DECEMBER 1, 2015**

1/31/2016

BRENDA WASHINGTON
Notary Public - State of Florida
Commission # FF 919984
My Comm. Expires Oct 4, 2019
Bonded through National Notary Assn.